IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 03-F-104-1041(BNB)

UNITED STATES OF AMERICA,

        Plaintiff,

VS.

DAVID B. ST. GERMAIN, and
RANDY OVERLEY,

        Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
DAVID B. ST. GERMAIN
May 19th, 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF DAVID B. ST. GERMAIN,
produced as a witness at the instance of the
Defendant Randy Overley, and duly sworn, was taken
in the above-styled and numbered cause on the 19th
of May, 2005, from 9:19 a.m. to 6:02 p.m., before
Daniel J. Skur, Certified Shorthand Reporter in and
for the State of Texas, reported by stenographic
means, at the Courtyard by Marriott, 4165 Proton
Road, Dallas, Texas, pursuant to the Federal Rules
of Civil Procedure.

                Reported by:  Daniel J. Skur
                             Job No. 51397



EXHIBITS
BOUND
SEPARATELY



# CERTIFIED COPY

Sunbelt Reporting & Litigation Services

4545 Bissonnet, Suite 100      15150 Preston, Suite 300
Bellaire, Texas 77401          Dallas, Texas 75248
713 • 667 • 0763             214 • 747 • 0763
713 • 661 • 3838 (Fax)       972 • 401 • 9733 (Fax)

EXHIBIT A-3

*www.sunbeltreporting.com*

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

46

1    Q.    Right.  No, I guess I'm talking about
2    his investigation.
3    A.    Right.
4    Q.    And --
5    A.    He didn't investigate before he was my
6    probation officer.
7    Q.    No, he didn't, but when he became your
8    probation officer, he went back to 1997 to see if
9    you violated conditions of probation going back to
10   1997, right?
11   A.    Sure.  Yeah.
12   Q.    Yeah.  Okay.
13   A.    He did.
14   Q.    And then what is your understanding of
15   when his investigation ended as far as a timeline
16   is concerned?
17   A.    When he filed this petition with the
18   court.
19   Q.    Okay.  This petition was filed On May
20   10, 2000; do you see that on page 2, bottom line?
21   A.    Uh-huh.
22   Q.    From 1997 to May 10, 2000, did you
23   commit any crimes not listed in this narrative?
24   A.    I committed no crimes, period.  These
25   are violations of probation, and that was made

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1    A.    Fall of -- the fall of --

2    Q.    2000?

3    A.    -- 2000.  2000?  Yeah.

4    Q.    And I'm going to have to apologize to

5  you because I have been referring to Deposition

6  Exhibit Number 3, the deposition -- excuse me, the

7  transcript of that hearing as being a March 2001

8  hearing.  Actually looks like February 20, 2001.

9    A.    Yeah, okay.

10    Q.    Does that cause you to need to correct

11  any of your testimony?

12    A.    No.  I don't think so.

13    Q.    Did you understand that when I was

14  referring to March of '01, I was actually referring

15  to the February 20 revocation --

16    A.    Same hearing.  There was only one.

17    Q.    Well, there was another hearing that

18  took place with Mr. Steinberg, right?

19    A.    Sure.  Right.  That was essentially when

20  I believe we had agreed to the 18 months.  The

21  judge said he didn't have agreement to that.  He

22  had stated already out of my presence that he was

23  going to take nothing less 10 years, so I went

24  through my agreement at that short hearing.

25         MR. ALBERTO:  One question.

1  O'Rourke's office to try to get my sentence
2  reduced.
3      Q.    Now, this Harold Henry, where is he
4  located?
5      A.    He's -- I believe he's in Canada now.
6      Q.    How did you -- how did it come that he's
7  holding 25,000?
8      A.    Well, he was a friend of mine, and I got
9  very paranoid during that stretch of time, and as I
10  was being stalked and staked out and everything
11  else, and it was looking like I was in big trouble,
12  and I asked him to hold some money for me in case I
13  needed it for an emergency which ultimately I did.
14      Q.    Let me ask you, exactly when did you
15  give it to him?
16      A.    I don't know that it was even an exact
17  time.  I think I might have given him 10,000 here,
18  5,000 here, whatever, as I accumulated some cash.
19      Q.    You mentioned you did so under some kind
20  of duress, that you were being stalked out.  Is
21  that during the investigation of Mike Wilson that
22  you gave it to him?
23      A.    Yeah.  Yeah.  Yeah.  Yeah, because he
24  was investigating me right up until this -- this
25  petition was filed, and that brings us to 2000.

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  your aunt's name?

2      A.    My aunt?

3      Q.    I'm sorry?

4      A.    My aunt?

5      Q.    Correct.

6      A.    Which aunt?

7      Q.    Any aunt.

8      A.    I don't think so.  I think it might have

9  been in my mother's name originally.

10     Q.    Mr. Kob said that the office building

11 you -- in the office building you had an

12 off-the-books interest, and it was refinanced about

13 six months ago from October of 1999.  Sound right?

14     A.    Yeah.  Yeah.  Probably about right.

15     Q.    Mr. Kob says you no longer own an Aurora

16 apartment building because it was sold, correct?

17     A.    Right.

18     Q.    Did you ever tell Mr. Kob about any

19 offshore accounts?

20     A.    No.

21     Q.    Going back to Deposition Exhibit Number

22 4 to page 2, middle of the page, if probation is

23 saying that they contacted Mr. Kob in September of

24 1990 -- excuse me, August of 1999 and Mr. Kob is

25 disclosing the information that's contained in that

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1   paragraph starting with on August 17, would you

2   have any disagreement that that's when probation

3   first became suspicious that you had violated

4   conditions of probation?

5        A.    Certainly they're investigating me at

6   that point.  I would not disagree with that.

7        Q.    Mr. Kob says that Craig Mundt owns or

8   works for a real estate outfit identified as

9   International Network, true?

10        A.    Yes.

11        Q.    Mundt is thought to have owned the

12   property that the log cabin is on and sold it to

13   you in the name of Overley, true?

14        A.    Yes.

15        Q.    Mr. Kob said that you flew in a private

16   jet with some friends, true?

17        A.    Partially.  It was a twin engine, twin

18   prop, not a jet.  Twin prop.  I was taking flying

19   lessons at the time.  Bill Hewitt, a friend of

20   mine, was taking flying lessons at the time, both

21   living in Denver.  And Jeff was living here, and

22   two pilot instructors, one of them was Mike Plumer,

23   my instructor, and friend of his who was also an

24   instructor.  And, yeah, we flew to log some hours

25   and landed right here at the Addison airport, as a

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1      Q.     Okay.  So by the end of December 1999,

2   Berliner realized that you were in trouble with the

3   authorities, right?

4      A.     Yeah.  But as I -- remember, as I said

5   earlier, they had been in asking around in the

6   fall, and we bought it in October, and they were in

7   there November, and I don't know who "they" were,

8   but I was just getting from bar tenders or

9   waitresses whatever, somebody is -- that went to

10  Bob and told Bob, somebody is asking question about

11  Dave.  I think it's DEA, or I think it's whoever.

12     Q.     Okay.  And --

13     A.     IRS.

14     Q.     -- so that's what Berliner is getting at

15  when he says to you at the end of December '99 that

16  I have to disassociate myself from you?

17     A.     Yeah, because I mean, there had been

18  some questions asked of the employees, went to Bob

19  as the owner and said Bob, they're asking questions

20  about Dave as the guy who is helping you run the

21  show over there, and Bob would question me about

22  it, and I said, yeah, you know, really?  And then I

23  was getting vibes that there was this investigation

24  going on, so he was getting progressively nervous.

25  It was his nature anyways, and then, ultimately, he

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  went and met with this attorney.  As a result of

2  these questions, his attorney said cut him out.

3        Q.    Okay.  Okay.  Now, if I get the

4  chronology right, what happened was that Berliner

5  cut you out late December of 1999, right, and then

6  shortly --

7        A.    Yes.

8        Q.    -- thereafter, Lambert says I don't want

9  anything to do with you, right?

10       A.    Yeah.

11       Q.    Okay.  I'm trying to figure out where

12  Overley fits in here in terms of when he said to

13  you I don't want anything to do with you.

14       A.    When I turned the motorcycle in, which

15  was January?  Shortly thereafter.

16       Q.    You mean the beginning of January?

17  February maybe?

18       A.    I mean, because I was still continuing

19  to work on the house.

20       Q.    You were?

21       A.    Yeah.  He went to Lee Foreman and, you

22  know, explained what was going on, and he got the

23  same advice.  You got to disassociate yourself with

24  this guy.

25       Q.    Okay.  So sometime in January, maybe --

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1    A.    Yeah.

2    Q.    -- February --

3    A.    Yeah.

4    Q.    -- he -- he says I'm done with you?

5    A.    Yeah.  So turn the truck in, cell phone.

6  I remember ran out of gas driving the motorcycle

7  over to his house and -- to drop it off, and said,

8  you know, says, Dave, I'll take the project over

9  from here.  You can't be involved with it on the

10  house.

11    Q.    And did you say anything back to him?

12    A.    I just -- you know, I -- everything was

13  being taken from me at that point, and you know, I

14  still wanted to try to see if somehow we can't work

15  our way through it, and he was having none of it.

16    Q.    Let me ask you something.  You're

17  talking about how maybe you could try to salvage

18  this house, but weren't you barred from

19  participating in real estate transactions without

20  the advance approval of the probation officer?

21    A.    Yeah, I was, but I mean, I had long ago

22  broken that.

23    Q.    Right.  I understand, but I'm saying

24  that your -- here is a situation.  You know that

25  the authorities are suspicious of what you're

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

139

1   A.   There was no mortgage payments due.

2   Q.   Wasn't there a mortgage payment due on

3   January 1, 2000?

4   A.   That's about when Randy booted me.

5   Q.   In January 1 of 2000?

6   A.   It was right around there.  It was

7   within weeks of that.

8   Q.   So it wasn't February of 2000?

9   A.   It was within a 30-day stretch,

10  somewhere between the first week of January and the

11  first week of February, and you know it wasn't --

12  it was a discussion that took place over several

13  weeks, and, you know, because I was trying to

14  convince him that, you know, you can't just boot me

15  out of this deal, and then when it looked like I

16  had no say, I'm done.

17  Q.   Who was having the discussion?  Were you

18  having the discussion, or was Mr. Overley having

19  the discussion?

20  A.   We discussed with each other.

21  Q.   Okay.  Did he say anything other than

22  you're terminated; you're done?

23  A.   Yeah, but we spoke further about it.

24  Q.   Who was doing the speaking?

25  A.   We both did.  I mean --

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

140

1    Q.    Was he saying, well, yeah, there's a
2  possibility that you could stay on?
3    A.    No.  No.  I don't think he was saying
4  that.  I mean, he was -- he basically was standing
5  his ground.  You know, Dave, I can't.  You know,
6  you got to -- this is -- this is -- as a matter of
7  fact, at one point he says I think you're going
8  back to prison.  And you know, so unbeknownst to
9  me, he was already talking to these guys, and I
10 didn't know any of that, and I felt, you know, at
11 that point, I knew that, well, I guess I'm done
12 with this.
13   Q.    Mr. Overley's termination of you in
14 terms of working on the log cabin took place
15 anywhere from January 1 to February 1; is that what
16 you're saying?
17   A.    Something like that.  I would say that's
18 pretty accurate, yeah.
19   Q.    The first mortgage payment was due on
20 January 1, correct?
21   A.    Right.
22   Q.    Did you make that mortgage payment?
23   A.    We were discussing whether I was going
24 to stay on board at that point, so I was not about
25 to shell over the payment until I knew he was going

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

141

1  to allow me to continue.

2      Q.    Is that --

3      A.    Once he decided that I was not going to

4  continue, then I wasn't going to be paying --

5  continuing to pay into that house for something

6  that I was going to be 86ed out of because I had

7  paid over a hundred thousand into that house at

8  that point already.

9      Q.    Okay.  And is your answer no, you did

10 not make the mortgage payment?

11     A.    I -- I felt -- I tell you what my answer

12 is.  My answer is that I was removed from the deal

13 prior to that mortgage payment being due.

14     Q.    All right.  So you're answering a

15 question that I haven't asked, and my question is:

16 Did you make the payment, or did you not make the

17 payment?

18     A.    I did not because I was removed from the

19 deal.

20     Q.    Did you make any payments on any loans

21 in connection with First Bank and the log cabin?

22     A.    Yeah, I made all the land payments.

23     Q.    How much were the land payments?

24     A.    400 -- $460 or something like that a

25 month so -- closed in April, so the first payment

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1    Q.    How long have you had this job?

2    A.    Since December, six months.

3    Q.    When did you come down to Dallas?

4    A.    December.

5    Q.    In October of 1999 or November of 1999,

6 did you happen to notice your probation officer

7 tailing you?

8    A.    Yeah, one time I did.

9    Q.    If I told you the probation notes appear

10 to indicate that this occurred in October of 1999,

11 would you have any disagreement with that?

12    A.    It sounds about right.

13    Q.    What was your understanding about why

14 they were tailing you?

15    A.    Well, they were interested in what my

16 true activities were on a daily basis.

17    Q.    Meaning that you thought that they

18 suspected that you weren't necessarily spending all

19 of your business time at Overley's?

20    A.    Right.  As a matter of fact I was on the

21 phone with Randy as I'm driving down the highway

22 and they're behind me and I was explaining to him

23 what was going on.  I'm being followed.  I'm

24 heading to your house.

25    Q.    Okay.  Do you remember talking to

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1    Q.    Were you there for the closing on the

2    land loan?

3    A.    I was not.

4    Q.    Were you there for the closing for the

5    construction loan?

6    A.    No.

7    Q.    When you went with Mr. Overley to meet

8    with Mr. Nixon, did Mr. Overley tell you not to say

9    anything about your 50 percent interest in the

10   home?

11   A.    I think we probably discussed that ahead

12   of time and determined that I should represent

13   myself as the general contractor --

14   Q.    Okay.

15   A.    -- that does a lot of the legwork for

16   him.

17   Q.    Okay.  Did it make any sense to you that

18   a general contractor would need to go with the

19   homeowner to the bank for a loan?

20   A.    Well, we both knew what our real

21   arrangement was.

22   Q.    Right, but did it make any sense to

23   present that picture to a lender that here is the

24   general contractor; here is the homeowner; we're

25   both here together; we're asking about a loan?

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

148

1    A.    Well, not necessarily.  It wouldn't

2  present a problem.  I mean, I had been in real

3  estate for a long time and done quite a bit of --

4  very many loans and Randy really hadn't, and I was

5  assisting him with the financing process as well.

6  I mean, this was a friend of mine that I was

7  working with to help get this house built.

8    Q.    You said that I think we may have

9  discussed this before we went to the bank.  When

10  you say you think that, do you have a specific

11  recollection of having discussed it?

12    A.    No, but I'm sure we would have got our

13  ducks in a row as to what our story was going to be

14  and our presentation was going to be.  We wouldn't

15  just go in there without discussing it knowing that

16  what we were presenting was not the real deal.  Got

17  to get those ducks in a row first.

18    Q.    All right.  Did you have any ability to

19  get a loan of your own, set aside the probation

20  condition about getting a loan?

21    A.    Well, probably not.  I didn't have any

22  credit.  I didn't have bad credit.  I didn't have

23  good credit.  I didn't have any credit because I

24  had done nothing in my name for years.

25    Q.    Well, plus you filed for bankruptcy

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

156

1    Q.    Okay.  Who were the subcontractors?

2    A.    Well, the only one I can remember

3 specifically was Shane.  He was the main guy that

4 was going to erect the logs themselves.

5    Q.    How about generically who were the

6 subcontractors?

7    A.    The names?

8    Q.    No, just what they did.

9    A.    Okay.  Well, we had the forms, forms

10 guy, the forms company that set the forms for the

11 footing and the forms for the walls for the

12 foundation; concrete company that came in and

13 poured the concrete for the footings and for the

14 walls; the excavation company, Larry Overley, to

15 then backfill against the walls once the forms were

16 removed; the vendor Home Depot provided all the

17 lumber for the floor deck package.

18    Shane went in, started to erect logs.  I

19 contracted with an electrician that had some

20 experience with wiring log homes which is different

21 than stick construction.  Same with plumbing, HVAC,

22 roofing, roofer which was a friend of Randy's who

23 ultimately ended up doing the roofing, and window

24 company, exterior door company.  So by the time

25 that I left, all of those subcontractors were in

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

160

1  day because Scott would go up every other day, kind

2  of switched off on that.

3      Q.    The deal with Parker Place and Texaco

4  was a -- kind of a partnership with Lambert, right?

5      A.    Right.

6      Q.    The deal with the log cabin was some

7  kind of a partnership with Mr. Overley.

8      A.    Right.

9      Q.    My recollection is you said that that's

10 a 50/50 split between the two of you, Mr. Overley

11 and you on the log cabin.

12     A.    Right.

13     Q.    Your job was to be the general

14 contractor.

15     A.    Right.

16     Q.    And his job, his only job was to get a

17 $330,000 loan.

18     A.    Right.

19     Q.    He was not supposed to have any

20 out-of-pocket expenses.

21     A.    Correct.

22     Q.    You wanted the house because you wanted

23 to move into it at some point?

24     A.    Right.

25     Q.    You wanted to live in it?

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1      A.      Right.

2      Q.      Essentially, you were going to rent it

3 in a way because you're paying rent to Mr. Overley

4 who then is paying the mortgage.

5      A.      Right, the rent would have been the

6 amount of the monthly obligation.

7      Q.      Was it your belief that $330,000 was all

8 it would take in order to build that house, the log

9 cabin?

10      A.      No, I knew it would take more than that,

11 and I had some money that I was going to put into

12 it, which I did put into it.

13      Q.      Okay.  Didn't you do some kind of an

14 estimate of how much it would cost to construct

15 that log cabin before the work got started?

16      A.      I did.

17      Q.      And how much was that?

18      A.      To be honest with you, I don't remember,

19 but I know that I went over it.  I know that I went

20 over it.

21      Q.      You went over it?

22      A.      It was -- it was probably -- I mean, I

23 don't remember what the number was, to be honest

24 with you.  I know it was higher than the loan

25 amount.  That's why I had to put the extra money in

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

162

1    because the loan amount wasn't enough to cover it.

2    I knew the loan amount wasn't going to be enough to

3    cover.  I thought it would be 40, 50,000 short.

4    And ended up being -- I don't know what it ended up

5    being because he finished it.  But I know that I

6    ended up putting in 110, $112,000.

7         Q.    Okay.  You don't know how much money he

8    put in after you left the project.

9         A.    I don't, and I don't know how much he

10   dressed the house out.  I'm sure he dressed it out

11   a lot more than what our plan was.  Plan was to

12   basically finish it, keep it rustic, you know, not

13   go crazy.  Knowing Randy, Randy has nice taste and

14   expensive taste, and he can afford it.  I'm sure he

15   dressed the house out a lot nicer than the original

16   plan was, and he has a lot more money into it

17   because of that.

18        Q.    This is a new element that I hear, the

19   agreement -- another part of the agreement was that

20   it would be a kind of a rustic log cabin, meaning

21   not dressed up, to use your words.

22        A.    Well, you know, we had a budget, and the

23   budget was the loan amount plus the budget was I

24   want to say about $380,000 so we couldn't go too

25   crazy with fixing the place up and fixing it out

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

163

1    and dressing it out, so therefore --

2          Q.    Is anything in writing as far as what --

3    what was going to be dressed in the house?

4          A.    No.  No.  We were just going to do -- it

5    was something that we were going to dually decide

6    as we went along, like types of cabinets that we

7    would put in, how much would we spend; the types of

8    countertops, how much would we spend; flooring, how

9    much would we spend.  It was going to be an ongoing

10   team -- team basis.

11         Q.    Well, you've been in the real estate

12   business a long time, and I see you're now in the

13   construction business, and you know that cost

14   overruns is very common in the industry, right?

15         A.    Well, let me put it this way, I had not

16   been in the building business when I built this log

17   cabin.  I had built one home prior in Massachusetts

18   for my own personal residence, and other than that,

19   I've done no building other than doing face-lift

20   work on apartment buildings, new carpet, paint,

21   appliances, that type of stuff, so they can run

22   over; but, for example, the two houses that I'm

23   overseeing construction of right now, they're under

24   budget, and they're about 60 percent complete.  And

25   they're probably going to end up under budget.

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

164

1  Q.   Are you talking about the rough
2  construction or finish?
3  A.   The entire construction.
4  Q.   It's going to be under budget?
5  A.   Yes.
6  Q.   Okay.  Would it be fair to say that in
7  terms of trying to understand this kind of oral
8  agreement that you had with Mr. Overley that the --
9  there are a lot of decisions that have to be made
10 in every house, and you weren't going to make all
11 the decisions ahead of time with regard to finish,
12 colors, a lot of things, right?
13 A.   No.  A lot of it you do as you go.  You
14 have a general idea of the direction you want to go
15 in, and as things unfold, from one phase to the
16 next, you know, you continue to move in that
17 general direction, but you make your hard decisions
18 as you get closer to each phase, and that we were
19 going to do jointly.
20 Q.   The plumbing fixtures, by the time you
21 got terminated, had they been selected?
22 A.   No.
23 Q.   Cabinets, had they been selected?
24 A.   No.
25 Q.   How about the landscaper, had that

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1   person been selected?

2       A.    Well, it was going to be Larry.  I

3   better tell you, I mean, I've been in the house

4   since he had it completed, and before he moved in.

5   This is years ago, and it was beautiful.  You know,

6   I mean, I've been in his other house in Sedalia,

7   which was more of a plain ranch and -- but, you

8   know, he did a lot of fixing up, fixed things up

9   himself and had some work done, and he has good

10  taste.  He has good taste.  He has expensive taste.

11  And you know, he did the house up very nicely.  And

12  I know it wasn't cheap the way he did it.  That's

13  not the way we were going to do it up while I was

14  building because we didn't have the money -- well,

15  I didn't have the money to put in.

16      Q.    What did you in terms of the -- you

17  mentioned expensive taste a couple of times now.

18  What did you see in the house that was kind of

19  emblematic of expensive taste?

20      A.    Well, I mean, these huge, humongous

21  chandeliers, wagon wheels and antlers and just

22  oversize, I know they're costly.  Granite

23  countertops, oak cabinetry, top of the line Berber

24  carpeting, lots of hardwood flooring throughout

25  instead of a lesser carpet, a lot less hardwood

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1   flooring, more average looking chandeliers, ash

2   cabinets versus oak, cultured marble tops perhaps,

3   something that looks nice but just isn't over the

4   top.  Wine coolers, built-in wine coolers, built-in

5   wet bar, a lot of extras and niceties that he's put

6   in that, you know, cost a lot more money than what

7   the plan was originally.

8       Q.    What was your understanding in terms of

9   how it would look like?  I mean, you just described

10  what the house now looks like.

11      A.    Well --

12      Q.    What were you expecting if you had

13  gotten to finish the project?

14      A.    Like I did say, instead of putting

15  granite counter tops, perhaps it would be tile

16  countertops, cultured marble countertops.  Instead

17  of doing marble, real marble bathrooms, you know,

18  it would be tile work.  It would be -- instead

19  Berber carpet, whatever cost a yard, it would be

20  middle of the road grade that still looks very

21  nice.  Instead of having, you know, maybe having a

22  quarter of the hardwood flooring in there that he

23  has or going with -- the hardwood flooring that he

24  has in there, it's not inexpensive hardwood

25  flooring but going with a little bit more -- a

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  little bit of a less expensive hardwood flooring.

2  Chandeliers, lighting fixtures, plumbing fixtures,

3  going with a heck of a lot less expensive fixtures

4  than what he's put in there.  Wine racks, wine

5  coolers, those type of things weren't going to go

6  in there.

7       Q.     Anything else you can think of?

8       A.     Landscaping, I know he put about a

9  hundred trees in there.  He planted about a hundred

10  trees in there.  Those aren't cheap.  So, you know,

11  that wasn't going to happen.  Some of the stuff

12  might have got upgraded over time, but that was not

13  the original plan or concept.

14       Q.     Did you and Mr. Overley talk about what

15  was going to happen if one of you defaulted on your

16  end of the bargain?

17       A.     You know, I don't think we ever resolved

18  what would happen.  I know it was just kicked

19  around, and you know, we both felt that the risk

20  was minimal because the value was there far and

21  above the amount of the obligation or the

22  liability, if you will.  And that's what we were

23  looking at, focusing on, is that difference between

24  the value and the liability, what's into the house,

25  and that cushion being the equity and that's what

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1   we were going to split 50/50.

2       Q.    I'm sorry.  What were you going to split

3   50/50?

4       A.    The equity in the property.

5       Q.    The equity in the property?

6       A.    Right.  At being built out the way we

7   initially described it.

8       Q.    Meaning the equity without the -- equity

9   of the house as it was built out without the extra

10  fancy stuff?

11      A.    Yeah.  In other words, you know, I know

12  Randy's probably spent three times what would have

13  been spent cash out of pocket to dress the house

14  out the way it's dressed out.  Whether it increased

15  the equity by three times is highly unlikely.  But

16  if the guy is going to live in the house and it's

17  for his own personal satisfaction, that's not as

18  important.  It's not like it's an investment per se

19  as it was when we were doing it jointly.  It was --

20  it was a residence/investment, so you know, you're

21  not going to go through all these extra bells and

22  whistles.  You're really not going to get financial

23  return, you get aesthetic return back, but you

24  really don't get the financial return.  So he's

25  done that, and he hasn't got the financial return.

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1          So in other words, this probably, if you

2   add in the debt, the cash he has in and the cash I

3   have in, it's probably a lot smaller cushion than

4   it would have been had we decked the house out the

5   way we originally planned.

6        Q.    How long were you going to live in

7   there?

8        A.    I mean, going to live in there until

9   whenever.  There was no -- no time frame put in

10  place.

11       Q.    But you were mentioning it is an

12  investment.

13       A.    Right.  At some point, as we went down

14  the road, we would have just played it by ear.

15  Either we would have both decided, you know, let's

16  sell this thing and take the money and go our

17  separate ways, or take the money and go do

18  something else.  Maybe we'll each take 25 percent

19  of the profits and take the other 50 percent and

20  dump it into some other investment.  It was

21  something that we hadn't made a roadmap to but

22  something we were just going to kind of play as we

23  went down the road.

24       Q.    All right.  You briefly mentioned the 95

25  percent number.  When you say that log cabin was 95

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  my name.

2          Q.    So you didn't open up the account.

3          A.    I'm sure it wasn't in my name, and I

4  don't remember if it was in Randy's name or -- I

5  don't remember, to be honest with you.

6          Q.    Okay.  The next two items, September

7  of '99, that's just cash, no check involved at all.

8          A.    Right.

9          Q.    Where did you get that cash?

10         A.    It was my own cash.  Like I say, I was

11 putting my own cash into this, and that's part of

12 it.

13         Q.    Okay.

14         A.    I had cash that was -- I would cash a

15 paycheck from -- or distribution check from Parker

16 Place.

17         Q.    When you spent money, did you tell

18 Mr. Overley every time you spent money?

19         A.    No.  But I was keeping a tally.

20         Q.    Did you give him a copy of the tally?

21         A.    I'm sure we -- we discussed it.  I'm

22 sure we did, but that wasn't that important because

23 at the time, that was my -- coming out of my pocket

24 because I had 50 percent interest in the thing.

25         Q.    Right, and --

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

182

1      A.    If I was going to spend the money, it

2  was my money.

3      Q.    That was my next question, why would you

4  care to give Mr. Overley any accounting of monies

5  that you spent?

6      A.    I probably didn't.  I mean, you know,

7  I'm sure we discussed that I'm having -- you know,

8  I'm spending some money, but we knew that that was

9  going to happen, but I mean, did we get into a

10  specific list, probably not.

11      Q.    Right.

12      A.    I mean, I had to go through all my

13  records to compile this when, you know, --

14      Q.    Right.

15      A.    -- we were at the mess that we were at.

16      Q.    After --

17          MR. ALBERTO:  May I ask a question?

18          MR. GEE:  I'm in the middle of one.  I

19  just said "after."

20          MR. ALBERTO:  Okay.

21      Q.    (BY MR. GEE)  After you opened -- strike

22  that.

23          How much money was in that account, the

24  one that you opened with that 001 check?

25      A.    I don't remember.  I don't remember.  I

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

189

1    Q.    When "he came in" meaning Mr. Lambert?

2    A.    Right.

3    Q.    On C number 5, January of 2000, there's

4  cash, roofing, plywood, 896, see that?

5    A.    Uh-huh.

6    Q.    That's your cash I take it?

7    A.    Yes.

8    Q.    I thought you told me that the roofing

9  was completed by the time you got terminated?

10    A.    Well, roofing was in the process of

11  being done here, and I wasn't terminated until

12  probably a week or two later.  That's January 4th.

13    Q.    You're just getting the roofing plywood,

14  though, on January 4 of 2000?

15    A.    It's roofing, comma, plywood.  I mean,

16  plywood for other decking.  I don't know what the

17  plywood would have been used for.

18    Q.    So roofing, comma, plywood is what it's

19  supposed to say, right?

20    A.    But I wasn't supplying the roofing.  The

21  roofer brings the shingles.

22    Q.    You were supplying the sheathing for the

23  roof, right?

24    A.    I supplied the roof deck, that's right.

25    Q.    Okay.  And is that what this is?

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  and it was half empty, and I think I probably took

2  in $20,000.  The next year, '98 was probably

3  70,000, total of about 90, and then the next year

4  was probably about 110.  So all together it was

5  ramped up.  First year was only six months because

6  we only had it.  Then '98, then '99.  Then the 2000

7  is when I was delivery driving.

8       Q.     Right, and do you know what your gross

9  income was for 2000, more or less?

10       A.     Yeah, I don't think it was $10,000.

11            MR. ALBERTO:  What do you mean by you

12  gave me -- what did you give me, the 200,000?

13            THE WITNESS:  Given you -- you or Cohan

14  and then to you, but breakdown of my income from

15  Parker Place.

16            MR. ALBERTO:  Okay.

17            THE WITNESS:  For the time that I was in

18  there second half of '97, '98, and '99.

19            MR. ALBERTO:  This is on a sheet of

20  paper written out like --

21            THE WITNESS:  No.

22            MR. ALBERTO:  Was it verbal?

23            THE WITNESS:  I remember going through

24  my checkbook and adding up the deposits for the

25  Lambert account that was my own personal and, you

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

230

1  that?

2      A.    And it was from Henry to Randy?

3      Q.    It was signed by Henry and made out to

4  Randy Overley, and I believe that this -- you

5  talked about Chris Alberto talked to Mr. Overley

6  about this at his deposition, and I don't have any

7  of the depositions with me right now.

8          MR. ALBERTO:  I can't recall.

9      Q.    (BY MR. GEE)  Okay.  And my memory, if

10  this helps you at all, is that Mr. Overley said:  I

11  never cashed those checks, and they were issued

12  right around the time that you got terminated, end

13  of December '99, beginning of January 2000.

14     A.    Were two checks for $7400.

15     Q.    Totaling $7400.

16     A.    From the Harold Henry account?

17     Q.    I think it was a Harold Henry account.

18  I'll have to go up to my room and get it if you

19  think that's going to help you.

20     A.    Yeah, I'd have to see it.

21     Q.    All right.  Is it your testimony that no

22  part of that agreement with log cabin was ever put

23  into writing?

24     A.    Correct.

25     Q.    And at the time that you were terminated

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1    from the log cabin project, as kind of an

2    experienced real estate person, give me your kind

3    of rough estimate of what it was worth then?

4         A.    Like I say, somewhere between 550,

5    600,000, and you know, that was, what, five years

6    ago?

7         Q.    That's why I'm interested of knowing at

8    the time of your termination.

9         A.    So five years ago, I felt it was 85

10   percent complete.  Extrapolate that out.

11        Q.    You mean 85 percent of 600 or something

12   like that?

13        A.    Well, no.  I felt it was worth 600 at

14   its current stage, at the stage -- at the 85

15   percent completion.  So add another 120,000 to that

16   and a hundred percent complete, 720,000, $750,000.

17   That's not unreasonable at all.

18        Q.    Okay.  So 600 when it's 85 percent

19   complete, but more once it is complete.

20        A.    Yeah.

21        Q.    Do you know a date on which it was

22   complete?

23        A.    I don't because I know he dragged it out

24   for a couple years before he lived in it.

25        Q.    All right.

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

232

1      A.      I think it's sad with him not living in

2   it because I know he was going over there doing a

3   little here and there on the weekends. He didn't

4   really devote much time to it. I think he was

5   nervous about putting more money into it because he

6   didn't know what would happen.

7      Q.      In October of 1999, the closing is --

8   I'll just represent to you the closing was October

9   1 of 1999, ask you to make that assumption. How

10  much was the project worth at that time? And I

11  understand there's no roof on it or anything. I

12  just want to get your kind of rough idea.

13     A.      Well, heck, alls -- it was at -- was

14  that the date, was it October? I think it was

15  sooner than that because, I mean, I was spending

16  money over there before that date. Let's see. I

17  was spending money in -- I started the last day --

18  early September. So it would have had to have

19  closed sometime in September.

20     Q.      Why do you say that, because you

21  wouldn't have spent any money?

22     A.      Well, I spent $15,000 before the end of

23  September already with Larry Overley.

24          MR. ALBERTO:  What's the first check,

25  June '99?

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

270

1      Q.      The assets that you're claiming, did

2  anyone other than you help create those assets?

3      A.      Sure.

4      Q.      Okay.  How so?  We can start with Parker

5  Place if you want.

6      A.      Parker Place, Scott was in Colorado

7  negotiating the deal, and I was in Massachusetts

8  assisting over the telephone to put the deal

9  together.  Scott found the deal, and I provided the

10  capital, Bill Pierce provided the capital, so it

11  was a team effort to put that deal together.

12      Q.      Okay.  Now, you want to talk about the

13  log cabin?

14      A.      Randy provided the loan, and I provided

15  the sweat equity, if you will, to build the house

16  and the cash that it would take over and above the

17  loan to complete it.  Randy also provided some time

18  and some input helping with -- helping with the

19  design and floor plan, and as we were about to

20  enter into the actual decoration portion of the

21  house, he was going to also contribute his opinions

22  and suggestions as to that end.  So it was a team

23  effort there to some degree.

24      Q.      All right.  You had mentioned before

25  that the terms of the agreement that you had on the

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  continuing to work on -- as a general contractor on

2  building the log cabin, right?

3       A.    My intention was to do that.

4       Q.    And is it your belief that you would

5  have finished building the log cabin?

6       A.    You're asking me would I have been

7  prevented to do it because of the probation

8  problems?

9       Q.    I'm just asking about your beliefs.

10       A.    I would have attempted to do that.  I

11  would have attempted to do that if --

12       Q.    Okay.  Now, the money that you had put

13  in by the time you were terminated, let's say early

14  January of 2000, was $104,000, right, thereabouts?

15       A.    Yes.

16       Q.    Would you agree that $104,000 of your

17  contribution wouldn't have been enough in order to

18  complete the cabin, the log cabin?  I'm saying --

19       A.    No, I would have had to put more money

20  into it.

21       Q.    Do you know about how much more money?

22       A.    Probably 40,000 because I think we were

23  envisioning about 150 over and above the loan being

24  into -- about 480.

25       Q.    But you would be into it for 150?

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

275

1  have been no problem.  If they let me do zero, then

2  there would have been a problem.

3       Q.    Did Mr. Wilson ever suggest to you that

4  it was okay to violate any of the conditions of

5  probation?

6       A.    Sure he did.  Of course he didn't.

7  That's a silly question.

8       Q.    Okay.  And he knew that you were

9  involved as -- in this real estate transaction with

10  Mr. Overley, right, by -- I'm talking about by

11  January of 2000?

12      A.    By then he did, yes.

13      Q.    So I gather from your last couple of

14  answers that Mr. Wilson would not have allowed you

15  to continue on as general contractor on this real

16  estate deal.

17      A.    You have to ask him that question.

18      Q.    I'm asking you that question.

19      A.    It's not likely.

20      Q.    Well, did he say to you:  Sure, go ahead

21  and just finish up that real estate project?

22      A.    He was interested in sending me back to

23  jail.

24      Q.    Under those circumstances, I want to

25  come back to the question I asked you before, which

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  know, do they have an equity cushion in it.

2      Q.    Okay.  Did anyone make any false

3  statements to the lender?

4      A.    Not to my knowledge.  I don't know what

5  statements Randy made to the lender, but I wasn't

6  the borrower, Randy was.

7      Q.    The only person listed on the loan would

8  be Mr. Overley.

9      A.    Yes.

10     Q.    Was there anything wrong with that loan?

11 I mean, is there something shady or illegal about

12 that loan itself?

13     A.    No.

14     Q.    I saw in the amended complaint that --

15 that the plaintiff is referring to the loan as a

16 straw loan.  What does that mean to you?

17     A.    That Randy is borrowing the money on my

18 behalf.

19     Q.    Was he borrowing the money on your

20 behalf?

21     A.    Well, like I explained, he was borrowing

22 it on our behalf.  We were 50/50 on the deal.

23     Q.    It was a 50/50 deal.  His role was to --

24     A.    Borrow the money.

25     Q.    -- borrow the money?

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1    A.    Mine was to build the house and put the

2    cash in to do it.

3    Q.    Okay.  Now, if this is a draw loan, does

4    that mean that you have a 50 percent stake in the

5    liability represented by that loan?

6    A.    I don't know that a straw -- the

7    terminology of a straw loan has anything to do with

8    determining the liability stake, but I don't even

9    know who used the word straw.  Where did that come

10   from?

11   Q.    That would our friend, Mr. Alberto, who

12   used that term.

13   A.    And he probably used that because he

14   felt that Randy was fronting for me for at least 50

15   percent -- hiding at least a 50 percent interest in

16   that house, which therefore coined the term straw,

17   but was our agreement that I had a -- if the deal

18   went south that I had a 50 percent obligation to

19   the debt?  No, because neither one of us felt that

20   there was really much risk that the property would

21   be worth less than the amount of the loan.

22   Q.    Now, couldn't you look at the loan as

23   being Overley's commitment to the agreement that

24   the two of you made?  In other words, this is my

25   deal.  All I had to do is get the loan out, take a

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  risk that is not that great because I don't expect
2  to lose money on this, and my pal, Mr. St. Germain,
3  is going to do everything else.  I sit back and
4  look pretty?

5       A.    Those deals are done all the time.  He's
6  the money guy.

7       Q.    Is it shady to do a deal like that?

8       A.    They're done all the time.  There's
9  nothing shady about it.

10      Q.    Well, would you characterize it as a
11 straw loan?

12      A.    The only reason why it was characterized
13 as a straw loan is because I had a secret 50
14 percent interest, but Randy was being put front and
15 center as a hundred percent owner because he was
16 hiding my interest in the asset.

17      Q.    Well, wait, when he takes out a loan and
18 puts his name as the only name on the loan, how is
19 he hiding your interest in the property?

20      A.    Because we had a verbal agreement that I
21 had a 50 percent interest in the property.

22      Q.    Right.

23      A.    That we both attested to.

24      Q.    Right.  But does the bank care about
25 your 50 percent interest in the log cabin?

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  was in December '99?

2        A.      January.

3        Q.      January 2000?

4        A.      That was January.

5        Q.      Okay.  That's before I came to conduct

6  depositions in Denver.

7        A.      Yes.

8        Q.      Okay.  Up until that point, who was

9  doing the work -- okay.  Let me back up.

10              Up until that point, how much time did

11  Randy Overley invest in the construction of the

12  Franktown house?

13       A.      Nothing other than what he wanted to.

14  You know, he wanted to get involved with some of

15  the decision making as far as how we were going to

16  set the house on the site, you know, so we sat down

17  and I told him my idea, and he told me his idea,

18  and his idea was a better idea in that instance, so

19  we had the architect kind of redesign the way the

20  house and the garage is going to be set together,

21  but very little.  I mean, I keep him up to date.  I

22  would meet him down at the house maybe once a week

23  and, you know, he lived closer to it than I did, so

24  he would probably stop by on his own and kind of

25  walk in maybe have a few questions, but he spent, I

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  don't know, maybe an hour or two hours a week, of

2  his own volition.

3      Q.    What was his interest in making sure

4  that he was in on how the house was going to be

5  situated on the site and the architectural layout

6  of the house?  Why was he interested and concerned

7  about that?

8      A.    Because it was an investment for him,

9  and he wanted to see something go up and that was

10  done right in a way that would be marketable down

11  the road should we want to sell it, and so...

12      Q.    So the deal was up until the Denver Post

13  article.  That's the demarcation; is that fair?  Is

14  that a fair demarcation?

15      A.    Yeah.  It's pretty close.  Pretty close.

16      Q.    Up until that article, until it was made

17  public, the amount of time -- that was seen as an

18  investment to Randy Overley, correct?

19      A.    Right.  Correct.

20      Q.    And --

21      A.    Because I was going to live in it.

22      Q.    That's right.  And his -- how long were

23  you going to live in it for?

24      A.    Like I told Ty.  I mean, I don't know,

25  maybe a year, maybe 20 years.

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

302

 1      A.    Well, he was leasing an office right
 2  across the hall from us at Parker Place at that
 3  point, and his mother and his sister were in there
 4  most of the time, and Randy was there maybe a
 5  couple times a week, but mostly he still worked out
 6  of his house, so -- but when he was there, he would
 7  pop over to my office and I would fill him in on
 8  things, or he had already been down by the site and
 9  maybe had a question, and I explained, you know,
10  here is what the plan is with this, now we got this
11  subcontractor starting next week, and I would just
12  keep him apprised of the progress, and, you know, I
13  would stop across the hall because his mom or his
14  sister would prepare the ledger, the log which kept
15  track of, you know, salary, reimbursements, and all
16  this stuff.
17      Q.    This ledger that you're talking about,
18  did you ever see it?
19      A.    Yeah.  Like I say, I used to stop by,
20  and Mrs. Overley or Kim would give me a copy.  This
21  is the up to date; and, oh, by the way, we drove by
22  the house and you guys are doing just a great job
23  on the house.
24      Q.    Who would say that?
25      A.    Mrs. Overley.

ORAL DEPOSITION OF DAVID B. ST. GERMAIN

1  the time, make a showing for anywhere from an hour

2  to, as I say, three hours.

3       Q.    Was Randy Overley ever there when you

4  went?

5       A.    Sure, yeah.

6       Q.    How often?

7       A.    We probably met there couple times a

8  week because remember, he lived about eight miles

9  away, ten miles away, wasn't that far.

10      Q.    Why was he there?

11      A.    Just to monitor the progress, make sure,

12  you know, he was in approval as to the different

13  aspects or phases as it was being built, maybe

14  offer some suggestions.

15           MR. GEE:  Let's go off the record for a

16  second.

17           (Recess held.)

18      Q.    (BY MR. ALBERTO)  Now, with regard to

19  Mr. Overley's family, you -- I think you had made a

20  statement to me, and I want to know if I have it

21  right.  In a conversation I was interviewing you, I

22  think, when we were in Denver the last time or

23  something, and you had said that with regard to the

24  sister or the mother, that they would ask you how

25  is -- your house looks great, you know.  I heard