# Deposition
## of
# RANDY OVERLEY

≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈

*United States of America v. David B. St. Germain*

*United States District Court*
*District of Massachusetts*
*Criminal Action No. 94-10213-01-MLW*

*Taken by Plaintiff*
*January 24, 2001*

Reported by:
Janilynn L. Butler
Professional Shorthand Reporter

Transcript provided by:

*Kirkpatrick & Stenstrom, Inc.*
*333 West Hampden Avenue, Suite 601, Englewood, Colorado  80110*
*303-788-1858 • FAX 303-788-1844*

EXHIBIT A-10

4 (Pages 13 to 16)

---

13

1          A     David St. Germain.
2          Q     Did Mr. St. Germain ever talk about
3    Fresh Start Gas?  It is a corporation that owns a gas
4    station/convenience store, and a car wash location?
5          A     I don't know the name, but I know I
6    have heard of a gas station/convenience store, but I
7    don't know the entity.
8          Q     Did Mr. St. Germain ever talk to you
9    about this convenience store/gas station?
10         A     Very little.  I don't know a lot about
11   that.
12         Q     Do you recall anything that he said to
13   you about it?
14         A     That he was part-owner in a gas
15   station in Commerce City.
16         Q     Who was he part owner with in that gas
17   station?
18         A     Scott Lambert.
19         Q     And that was told to you by
20   Mr. St. Germain?
21         A     Yes.
22         Q     Do you recall where you were when he
23   told you this?
24         A     Not specifically.  Maybe his office or
25   Parker Place.

---

14

1               MR. COHAN:  Move to strike as
2    speculation.
3          Q     (By Mr. Alberto)  Do you recall where
4    you were when Mr. St. Germain told you that he had an
5    ownership interest in Parker Place?
6          A     I wouldn't specifically remember.
7          Q     Do you recall if anyone was with you
8    when you heard this statement by Mr. St. Germain?
9          A     I wouldn't recall that either.
10         Q     I would like to talk about the log
11   cabin home.  I understand you were involved in a
12   purchase of a log cabin home?
13         A     Yes.
14         Q     Can you tell me what arrangement you
15   had with Mr. St. Germain with regard to that log
16   cabin home?
17         A     He had a verbal agreement that I would
18   acquire a loan to construct and that he would
19   build -- he would general contract and occupy it at
20   the end of construction.  And he would cover any of
21   the additional costs outside of the construction
22   amount.  It was a 50/50 deal or a 50/50 ownership.
23         Q     You were going --
24         A     But I was the actual owner on paper.
25   The loan was in my name, the mortgage.

---

15

1          Q     What was your understanding of why
2    Mr. St. Germain wanted this arrangement?
3          A     A place to live.  So he had a place to
4    live.  I think primarily a place to live.  His plan
5    was to live there.
6          Q     I meant to ask why you think
7    Mr. St. Germain wanted the arrangement with you as
8    the title holder and not himself?
9          A     Just because of his financial
10   troubles, primarily.  That would be my understanding.
11   He had a recent bankruptcy and he couldn't put
12   anything in his name.
13         Q     When was this bankruptcy that you are
14   talking about?
15         A     I don't know exactly when.  I just
16   have known of a bankruptcy sometime in Boston when he
17   lived in Boston prior to moving to Denver.
18         Q     How long have you known Mr. David
19   St. Germain?
20         A     When he moved to town, probably almost
21   the first week.  I think that was '92, '93, maybe.  I
22   am not positive of the exact date.
23         Q     Where did you meet him?
24         A     I met him downtown here at an athletic
25   club.

---

16

1          Q     And this was in 1992?
2          A     I am bad with these dates, but it was
3    probably in that time frame.  I would think it is in
4    that time frame.  '91, '92, '93; just in that range.
5          Q     Did anyone introduce you to Mr. David
6    St. Germain?
7          A     Yes.
8          Q     Who was that?
9          A     Through a friend, a friend of mine
10   that works at the health club.
11         Q     Who is the friend?
12         A     Curt Miller.
13         Q     Subsequent to that meeting, did you
14   develop a friendship with Mr. St. Germain?  Was it a
15   common interest?  Tell me what it was initially.
16         A     I think we had some common interest.
17   I recall the first night that we went to the stock
18   show, so it must have been January of one of those
19   years that I spoke of.  Went to the stock show and so
20   we had some of that country western connection.
21               We both liked country music and it
22   probably developed from there.  It wasn't fast and
23   furious, hung out all the time.  We didn't hang out a
24   lot, ever.  It was one of those friendships where you
25   saw an occasion and maybe every couple weeks or more

---

8  (Pages 29 to 32)

29

1  don't recall any that were present when I was there
2  where he was talking specifically about it.  It
3  wouldn't surprise me.
4       Q    When you state that he was fairly
5  boastful about his ownership interest, would that
6  also apply to the convenience mart/gas station?
7       A    Again, that property came on later,
8  and I don't know that there would have been all that
9  much talk about that one.  It just came on later, and
10  I don't know a lot about that property.  I know very
11  little.
12            I just had heard they purchased the
13  gas station/convenience mart.  There was a car wash
14  associated, and they were collecting the cash out.
15  They always had trouble with the car wash.  They were
16  fixing jammed up machines, and I remember light
17  conversations like that.  I don't even know where it
18  is, Commerce City somewhere.
19       Q    Let me just talk about the log cabin
20  home.  Is that the right description?
21       A    Okay.
22       Q    You earlier testified about the
23  arrangement, that you would have a 50-percent
24  interest in that particular home?
25       A    That is correct.

30

1       Q    Were you planning on living there with
2  Mr. St. Germain?
3       A    Not particularly, no.  I own another
4  house not far and so, initially, no, that wasn't the
5  plan.
6       Q    Are you married?
7       A    No, I am not.
8       Q    Do you have children?
9       A    No children.
10       Q    So who lives with you at your home?
11       A    No one now.  Animals.
12       Q    When you said you didn't plan on
13  living there, was Mr. St. Germain going to pay you
14  rent?
15       A    He was going to pay the rent to live
16  there, yes.  That was our original agreement.
17       Q    What would be the rental amount?
18       A    Somewhere around $2,500?
19       Q    Would that cover your share of the
20  mortgage payment?
21       A    Yes, it would have.
22       Q    What is the status of the ownership of
23  that log cabin home today?
24       A    I own 100 percent of it.
25       Q    Have you been putting -- I understand

31

1  the home has had some kind of work done on the inside
2  recently; is that correct?
3       A    Yes.
4       Q    Have you been doing that?
5       A    I do as much as I have time to do.
6       Q    Have you hired people to do that?
7       A    Yes, I have.
8       Q    What is the status of the home now?
9  Is it complete?
10       A    It is about 95-percent complete.
11       Q    How did you end up with 100 percent of
12  it?
13       A    With our verbal agreement, the terms
14  were that, if for any reason he defaulted on his end,
15  keeping it occupied, finishing construction as the
16  general contractor, for any reason, that I would just
17  assume ownership and finish the construction, which I
18  have done.  It has been under construction now --
19  personally been under construction now for over a
20  year now, it has taken me.
21       Q    What do you plan on doing with the
22  home?
23       A    I plan on moving into it.
24       Q    Mr. St. Germain must have put up some
25  money initially to go in on this deal with you; is

32

1  that correct?
2       A    There was some money up front.
3       Q    What kind of money was up front?
4       A    I don't know all the specifics to
5  exactly how much.  I couldn't even begin to give you
6  a number as far as how much was put up.
7       Q    If you can give a ballpark, a number,
8  $10,000?  Let me back up.  Can you give me a
9  narrative?  Did you buy the land and then you got the
10  contractors?  Elaborate and explain how the land was
11  acquired or the house was set up to be built.
12       A    I have found the land and then came to
13  me and asked if I wanted to be involved in it, and I
14  showed some interest.  I wasn't sure exactly how it
15  would work or what the terms would be.
16            But I felt comfortable enough with his
17  ability to construct and run the project that it
18  seemed to make some sense at the time.  And it
19  sounded like a pretty good deal for me where I didn't
20  have to -- I really didn't have a headache with it.
21  I wouldn't have to be the general contractor.  I
22  wouldn't have to work every weekend like I have
23  worked.  I wouldn't have to occupy it.
24            The tenant arrangement was already
25  taken care of, and it would be carrying the note.

33

1   And I felt at the time, it was a good deal for me to
2   get involved.  So that is really what started it off.
3   He worked with the log plan and I helped a little
4   with some of the design work on it.  There were some
5   changes to the plan.  So I was involved, modestly, at
6   first, but certainly, full-time for the last 13 or 14
7   months, full-time.
8           Q   Is that when Mr. St. Germain
9   defaulted, as you called it?  14 months ago?
10          A   December of 1999, I believe it would
11  have been.
12          Q   And the default is that he didn't give
13  you a check for $2,500?
14          A   The mortgage started January 1 of
15  2000, and I have paid that mortgage since, not living
16  in it.  I have been paying the mortgage, $2,400 to
17  $2,500, right in that range, and then putting all of
18  the extra costs into it, which was not part of my
19  ownership was to put any additional cost.  I was not
20  to put a nickel into it, and I have put a lot of
21  money into it to keep the construction project going.
22  It was way under budget.
23          Q   Now, when you say you weren't to put a
24  nickel into it, this is for finishing off the inside?
25          A   Anything over the loan amount,

34

1   anything over the construction loan amount.
2           Q   What was the loan amount?
3           A   $330,000, right in that range, plus or
4   minus.
5           Q   What kind of money did you have to put
6   down to buy this property and go into this deal?
7           A   Initially, no money down.
8           Q   So it was a no-money-down mortgage?
9           A   No, there was money down.  It wasn't
10  my money.
11          Q   Whose money was it?
12          A   I assume Dave's money.
13          Q   How much was it?
14          A   I don't know.  Again, I can't
15  specifically answer that.  I don't know the actual
16  dollar amount.
17          Q   Who handled the negotiations with the
18  lender?
19          A   We both did initially, but primarily
20  me.  He was my banker.
21          Q   So Mr. St. Germain would give you the
22  money to put down?
23          A   There was some money put down, yes,
24  and again, I don't know specifically how much or the
25  details of all of that.

35

1           Q   Was it greater than $10,000?
2           A   It was.
3           Q   Was it greater than $20,000?
4           A   Probably -- again, not knowing all the
5   details.  He worked with some subcontractors that
6   were paid.  I don't know who.
7           Q   How would it work?  Would
8   Mr. St. Germain give you a check for the amount, and
9   then it would go into your account?
10          A   On some occasions, I know that
11  happened, but I just don't have a good recollection
12  of the details to all of the transactions or how
13  many.  The project was under construction from -- it
14  seems like only about three months that Dave was
15  involved in the project before he defaulted on it and
16  I picked it up and finished the project or am in the
17  process of finishing it.
18          It seems like it started in October of
19  '99, or maybe the August/September/October range by
20  the time the plan was delivered and shipped.  And
21  then by the end of December, it was clear that I had
22  to finish the project.  It was clear that -- in fact,
23  I made that the case, that I was finishing the
24  project.
25          Q   This is around the time you cut

36

1   contact off?
2           A   Exactly.
3           Q   Was this before or after the newspaper
4   articles on this Grizzly Rose situation?
5           A   In the same time frame.  The
6   December/January time frame was all of which that was
7   happening, and I can't recall again if that was
8   December that those articles were coming out, or
9   January.
10          Q   Now, just so I understand the
11  arrangement with regard to the payment of the
12  mortgage, the $2,500, what was that?
13          A   Plus or minus.  It was the mortgage
14  amount, the $2,300 or $2,400.
15          Q   And then you pay taxes?
16          A   Taxes would have been inclusive in
17  there.  Insurance was inclusive.  Utilities would
18  have been additional.
19          Q   So the arrangement would be -- well,
20  you tell me if I have it right or not.
21  Mr. St. Germain would pay the mortgage amount to you,
22  $2,300 or $2,500, whatever it is, and the deal was,
23  he would just continue paying that mortgage, and you
24  would own a 50-percent --
25          I am sorry.  Do you want --

10 (Pages 37 to 40)

**Page 37**

1   MR. FOREMAN:  May I, just a moment?
2   MR. ALBERTO:  Sure.
3   (Mr. Foreman and Deponent conferred.)
4   Q   (By Mr. Alberto)  Do you want to
5   clarify your testimony?
6   A   I don't know if the impression was
7   that he has paid the mortgage.  He has never paid the
8   mortgage.  I have paid the mortgage.  The mortgage
9   started in January of 2000, so I have paid that
10   mortgage now for 13 months.
11   Q   I assumed that you were the one
12   writing the check to the bank.
13   A   And I was never reimbursed for that.
14   Q   Oh, you were never reimbursed for
15   that?
16   A   No.
17   Q   So you never received the $2,300?
18   A   He defaulted in December of '99 or
19   January of 2000.  We cut all ties, all arrangements,
20   and I have since then paid my money, and all of the
21   overruns in construction, everything.  I have been
22   digging a lot this last year to keep this thing
23   going.
24   Q   Well, it sounds like the arrangement
25   never came about?

**Page 38**

1   A   Exactly.  It never came to fruition,
2   because of the default.  I have a couple of checks
3   that he had given me to reimburse me for some
4   expenses that I have never cashed, in excess or right
5   at $10,000 that I have never cashed, and that was
6   back in that same time frame when I cut all ties.  I
7   cut all ties.  Our arrangement was done.  He had
8   defaulted, and I finish the construction, and I
9   haven't seen any money since.
10   Q   Now, you mentioned that
11   Mr. St. Germain did give you some money.  Did you
12   accept some money from Mr. St. Germain?
13   MR. COHAN:  Object.  He didn't say he
14   gave him some money.  He spent money with
15   subcontractors, is what I heard him say.
16   Q   (By Mr. Alberto)  Regarding this log
17   home.
18   A   I don't know all the specifics to if I
19   received reimbursement or, in some cases,
20   subcontractors may have been paid.
21   Q   Let me back up, because you testified
22   that it was most likely greater than $20,000 that
23   Mr. St. Germain put into this log cabin home; is that
24   correct or incorrect?
25   A   That is probably accurate.

**Page 39**

1   Q   So this is at the time, originally,
2   that the land is being acquired; is that correct?
3   A   Yes.
4   Q   Now, you mentioned that there were
5   some checks you received from Mr. St. Germain and
6   which you did not cash.  Did you bring copies of
7   those with you?
8   A   We do have copies of those.
9   Q   And when you say that Mr. St. Germain
10   paid you these checks, I see they are written out by
11   Harold Henry.  Who is Harold Henry?
12   A   A friend of Dave's.  I believe that is
13   a friend's of Dave's.  He was.
14   Q   How do you know this money came from
15   Mr. St. Germain?
16   A   He handed it to me.
17   Q   What did he say when he handed it to
18   you?
19   A   It seems as if this was to reimburse
20   for some insulation material or a Home Depot bill or
21   something in that nature.  I don't recall.  One check
22   has a note in the memo area for Home Depot lumber, so
23   maybe that was for some decking.  I don't recall, but
24   in this time frame, that December of 1999, early in
25   December, I obviously have never cashed these checks.

**Page 40**

1   MR. COHAN:  Is this Exhibit 32?
2   MR. ALBERTO:  Yes I will make this an
3   exhibit right now.
4   (Deposition Exhibit
5   Number 32 was marked
       for identification.)
6   Q   (By Mr. Alberto)  Tell me what
7   Exhibit 32 is.
8   A   A copy of two checks.
9   Q   How did you come into possession of
10   those checks?
11   A   Dave St. Germain gave them to me.
12   Q   And why did he give them to you?
13   A   Reimbursement on some construction
14   material.
15   Q   Do you know who Harold Henry is?
16   A   I believe that to be a friend of
17   Dave's.  I know a friend of his named Henry and I am
18   assuming that is who that is.
19   Q   You have never met Mr. Harold Henry?
20   A   I have met Henry.  I only vaguely know
21   that Harold Henry to be Henry.  If you specifically
22   ask me if that is Henry, I assume, but I don't know
23   for sure.
24   Q   Did you ask Mr. St. Germain why he was
25   giving you checks from Mr. Harold Henry?

**41**

1    A    I probably didn't ask specifically.
2    Q    And when was it that these checks were
3  given to you?
4    A    One is dated 12/28/99 and one is dated
5  12/3/99.
6    Q    It is your testimony that you did not
7  cash the checks?
8    A    They have not been cashed.
9    MR. COHAN:  Are the originals here?
10    MR. FOREHAN:  No, they are in the
11  possession of Mr. O'Rourke.
12    Q    (By Mr. Alberto)  Why didn't you cash
13  them?
14    A    Because we had terminated our
15  agreement on this house and I didn't feel comfortable
16  cashing the check, because it happened in this time
17  frame, and I knew I was taking possession of the
18  house.  I knew there was no longer a deal, so I
19  didn't cash the checks.  And I paid for this
20  material, as I have since.
21    Q    Did you tell Mr. St. Germain, that
22  when he handed them to you, that you weren't going to
23  cash them?
24    A    I don't believe I did.  I don't think
25  specifically, because again, in that same time frame,

**42**

1  sometime in late December, we were done.
2    Q    Where were you when he handed you
3  these checks?
4    A    Specifically, I can't say for sure,
5  but Parker Place or -- I don't know.  Probably two
6  different occasions, even, because they are dated
7  different, so maybe it was two different occasions.
8    Q    And it is your testimony that checks
9  were given to you consistent with the dates on the
10  checks?
11    A    Again, I can't tell you specifically
12  if that is the exact date.  I would have to guess
13  that it is in that time frame.
14    Q    I know it never came to fruition, but
15  what was the arrangement with regard to the mortgage
16  payments?  How was that supposed to work?
17    A    I would make the mortgage payment, and
18  then he would pay me the rent, and I think he planned
19  on a roommate, so whether it was two checks or one
20  check.  But we understood the rent to be the mortgage
21  amount or thereabouts.  I wasn't -- again, I was not
22  to be paying costs out of pocket.  All my expenses
23  were to be covered.
24    Q    You mean, all your expenses to build a
25  house were to be covered?

**43**

1    A    Yes, and the mortgage amount, when the
2  mortgage started in January of 2000.
3    Q    So was it supposed to be compensation
4  for you that you would have a 50-percent interest for
5  going along with holding title to the house?
6    A    If I understand your question
7  correctly --
8    Q    You want me to rephrase?  So it
9  appears that the arrangement, where you would have a
10  50-percent interest in this log cabin house, was more
11  or less your payment or your compensation for being a
12  straw for Mr. David St. Germain.  Is that accurate?
13    A    It was never a straw.  It was a 50/50
14  deal; 50/50 ownership.  I secured the loan, and at
15  the time, we assumed the loan was enough to build
16  this thing.  And that if there were any additional
17  costs, Dave would pay the additional costs, expecting
18  little or none in additional costs, figuring that
19  $330,000 is enough to buy the property and build this
20  cabin.
21    That hasn't been the case, but that
22  was the plan.  And then he would simply move into it
23  and occupy it and pay rent to me, which would then
24  cover my mortgage payment.
25    Q    What I am trying to get at is,

**44**

1  assuming this deal did come to fruition, and
2  Mr. St. Germain performed as he said he would
3  perform, it sounds like it would be a very good deal
4  for you.
5    My question is, you are not paying
6  anything for this piece of property.  Mr. St. Germain
7  appears to be putting all the money in and paying the
8  mortgage and everything else, and you just have a 50
9  percent interest in it.  Is that a correct
10  understanding of what the arrangement is?
11    A    That is fairly accurate.
12    Q    Did you put any money -- I know you
13  have, but up front, when he put money up front to
14  acquire the property, did you put anything in?
15    A    Again, specifically, I don't know if I
16  have money up front that was never reimbursed for.  I
17  mean, I have money in it, absolutely.
18    Q    Why did you think Mr. St. Germain
19  would pay for everything, build the house, and do
20  everything, and you acquire a 50-percent interest in
21  this property?
22    A    He wanted to build a house and he knew
23  that he didn't have the credit ability to do that,
24  and he looked to me to assist.  And I felt it was a
25  reasonable good deal to do.

12  (Pages 45 to 48)

45

1          Q    So he was paying you -- or you are
2    ending up with a 50-percent-interest for basically
3    being the title-holder-and-borrower on paper; is that
4    correct?
5          A    I don't know if that is correct.  You
6    might look at it that way, but it was a good deal for
7    everyone.  He wanted a way to buy me out-at-some
8    later-date, that he would assume a different
9    ownership role in it.  But initially, he didn't have
10   the ability to carry the credit on it, and I did.
11         Q    So because you had the ability to
12   borrow, you got the 50-percent interest?
13         A    That is correct.
14         Q    You mentioned earlier in your
15   testimony that you weren't close friends with
16   Mr. St. Germain; is that correct?  Or am I
17   mischaracterizing that?
18         A    Maybe a little bit.  I wouldn't
19   classify us as best friends or any of that.  I would
20   say we were good friends.  "Close" may be a little
21   strong.  We did things together and he would come to
22   my house.  I was at his apartment, but not best
23   friends.
24         Q    You-were-close-enough-friends-to-lie
25   on-behalf of Mr. St. Germain to the probation

46

1    officer; is that correct?
2          A    I don't specifically recall a lie, but
3    if you ask me, maybe a different question, I might be
4    able to answer that differently.
5          Q    That is fair.  I might be able to give
6    you a better --
7               Now, I understand that on June 16 --
8    and I am representing to you this was told to me from
9    records that are held by the United States probation
10   office -- I represent to you that on June-16,-1997,
11   you were interviewed by United States Probation
12   Officer Keenan.  Do you recall being interviewed by a
13   probation officer in '97?
14         A    I do.
15              (Mr. Foreman and Deponent conferred.)
16         Q    (By Mr. Alberto)  Do you recall that
17   the probation officer asked you if Mr. St. Germain
18   worked for you?
19         A    I would again assume she did ask that
20   question.
21         Q    And do you recall that you stated that
22   Mr. St. Germain worked as a community relations
23   client contact person?
24         A    Again, I don't know specifically what
25   the job description would have been.  Maybe something

47

1    in that range.  Driver, courier may have come to
2    mind, too.
3          Q    Do you recall telling Ms. Keenan that
4    he did work for you?
5          A    Yes.
6          Q    Do you have a community relations
7    person in your firm presently?
8          A    No.
9          Q    Do you have a client contact person in
10   your firm presently?
11         A    I have my sister that does some of
12   that for me.
13         Q    Was that the truth when you spoke to
14   Probation Officer Keenan in June of 1997, that
15   Mr. St. Germain worked for you as the community
16   relations contact person?
17         A    No, that wasn't.
18         Q    That was not true?
19         A    That is correct.
20         Q    And on January 20, 1998, I represent
21   to you that you again confirmed that Mr. St. Germain
22   worked for you to the probation-officer that
23   interviewed you.  Do you recall being interviewed in
24   1998?
25         A    Who would this have been this time?

48

1          Q    I don't have the name of the probation
2    officer.  I don't know if it was Probation Officer
3    Keenan.
4               MR. COHAN:  What is this that you are
5    representing that you have?
6          Q    (By Mr. Alberto)  I represent to you
7    that the United States probation office documents
8    reveal that they contacted you on January 20, 1998.
9    Is that accurate?
10         A    I don't again specifically recall.  My
11   recollection of any conversations with probation was
12   the initial meeting with Kathy Keenan, and possibly
13   one other conversation with her.  I don't
14   specifically recall if I had any additional
15   conversations with her, maybe a voice mail.  So I
16   don't have specific recollection of that.
17         Q    Let me -- actually, it is Probation
18   Officer Keenan that contacted you on January 20,
19   1998, according to the probation office documents.
20   And you confirmed to her that Mr. St. Germain was
21   working for you in 1998, at that time.  Do you recall
22   that?
23         A    Again, I may not have a specific
24   recollection of that, but I don't deny that I had
25   another conversation with her, only once in person,

73

1    Q    Do you recall where you were when he
2  gave it to you?
3    A    Again, maybe not specifically, but
4  probably Parker Place.  I would have to guess.
5    MR. ALBERTO:  Why don't we go off the
6  record for a second, because I want to get through
7  these other things and maybe we can do this quicker.
8    (A recess was taken from 12:14 p.m. to
9  12:19 p.m.)
10    (Deposition Exhibit
11    Numbers  40 through 42 were
    marked for identification.)
12    Q    (By Mr. Alberto)  What is Exhibit 40?
13    A    An Executive Summary for Ivy-K
14  Shopping Center.
15    Q    Who gave you that?
16    A    Dave.
17    Q    Why did he give it to you?
18    A    I am assuming that it was given to me
19  as looking for investors on this shopping center.
20    Q    Who was looking for the investor?
21    A    Dave was.
22    Q    Why do you say you are assuming?
23    A    Well, I probably never read through
24  this whole thing.  These things were given to me on
25  occasion, and I wasn't particularly interested in any

74

1  of this.  I don't know specifically all the details
2  to what this thing is.  It looks to me that it is
3  maybe a spreadsheet on investor returns and some
4  detail of costs associated with the property.
5    Q    You didn't ask Mr. St. Germain to make
6  out those charts?
7    A    Did I ask him to?
8    Q    Yes, those charts.
9    A    Oh, no.  This was done generically for
10  anyone interested in investing.  It wasn't done for
11  me.
12    Q    Do you know if Mr. St. Germain made
13  those charts out?
14    A    I don't know specifically if that is
15  his.  I would assume that was his work.
16    Q    Why do you assume that?
17    A    Because he was on the computer a lot,
18  and whether this was one he prepared or someone else,
19  I don't know.
20    Q    Did you see similar spreadsheets up on
21  his computer screen like that?
22    A    Without saying specifically, maybe he
23  did, but I can't say specifically it was this one or
24  something else, or if it was even a spreadsheet
25  relating to the property.  It could have been

75

1  household expenses.
2    Q    Did you ever see a spreadsheet on his
3  computer screen?
4    A    On the computer, probably not.  The
5  computer -- he was facing the other direction.  I
6  don't think I ever walked around to look.
7    Q    If you can look at Exhibit No. 41 and
8  tell me what it is.
9    A    This was given to me when we entered
10  into this house agreement.
11    Q    Who gave it to you?
12    A    Dave.
13    Q    What house agreement?
14    A    On the log home.
15    Q    Why did Dave give you that?
16    A    He wanted at some point to buy me out
17  of the house, so he prepared documents, which I
18  didn't sign and I wouldn't have signed, but that is
19  what this is.  It is an option for him to purchase
20  that property from me at some later date.
21    Q    And why wouldn't you sign it?
22    A    I didn't want anything to do with
23  this.  That wasn't my intent on this property, to
24  give it to him, but this was basically what he was
25  expecting me to do here.

76

1    Q    When did he ask you to sign it?  When
2  he bought the property?
3    A    No, this was after the fact.  This is
4  after the fact.  He didn't like my opinion of some of
5  the stuff that I expected to have done with this
6  piece of property, and he wanted to put other things
7  in it, a pool and things of which that he felt -- I
8  didn't want a pool.  I didn't want the expense of a
9  pool, or whatever.
10    So at some point, he knew that he
11  needed to buy me out of it in order for him to do
12  whatever he wanted to with this house, because I was
13  done spending money.  I just wanted to get it done.
14  So then he started presenting options to purchase it
15  from me at a later date, and this is an option for
16  him, I think, to purchase it from me within a certain
17  period of time, until January of 2003 or 2005.  I
18  don't know why that is crossed out.
19    Q    Exhibit No. 42.  Take a look at that
20  and tell me what it is.
21    A    Again, it looks like more spreadsheet
22  on potential investments with other properties.
23    Q    Who gave you that?
24    A    Dave, again.
25    Q    Are you familiar with what is Pine

22 (Pages 85 to 88)

85

```
1       A   I don't know the source of his income.
2       Q   Or a source of income or cash?
3       A   If you want an assumption, I can give
4  you that.  I have never seen payroll checks and I
5  don't have bank access, but I assume it is Parker
6  Place and Cornerstone Management, and I assume it to
7  be a gas station.  That is all I am aware of.
8       Q   You mentioned earlier in the very
9  beginning of your deposition, if I recall correctly,
10 that you assisted the defendant with employment
11 status to help him with his other ventures, among
12 other reasons.  Do you recall that?
13      A   Okay, yes.
14      Q   What other ventures were you
15 contemplating when you stated that?
16      A   Parker Place.
17      Q   How would that assist him with Parker
18 Place?
19      A   It just gave him the time to pursue --
20 it just gave him the time.
21      Q   What other ventures were you aware of
22 at that time?
23      A   I know or assumed to know of some
24 properties in Texas that were being looked at.
25      Q   By whom?
```

86

```
1       A   Dave and Scott.  But I don't
2  specifically -- I wasn't involved in any of that.  I
3  wasn't interested in that.  There were some local
4  properties.  Parker Place, of course.  The gas
5  station.  The Grizzly Rose, I guess, would be thrown
6  in there.
7       Q   You also testified that the defendant
8  told you he was a 40- to 45-percent owner of Parker
9  Place; is that correct?
10      A   I think that is the number.  I am not
11 positive.
12      Q   Do you have any knowledge or
13 information as to what the consideration was for
14 Mr. St. Germain getting that percentage of interest
15 in Parker Place?  How did he get it?  What were the
16 circumstances?
17      A   Again, I am only speculating.  I don't
18 know specifically how they acquired the money, but
19 there were other properties in Denver, other
20 apartments, low-income apartments, that were sold at
21 some point prior to Parker Place.
22      Q   By Mr. St. Germain?
23      A   Yes.  Again, I am speculating here on
24 how the money --
25      Q   Why do you speculate that?
```

87

```
1       A   Because he was working at some
2  apartments, doing renovation, cleanup, and there is
3  reference in a letter here to the low-income housing
4  that they are getting ready to sell.
5       Q   Do you have any reason to believe he
6  had any ownership interest in any of this low-income
7  housing?
8       A   Again, my speculation is that he did.
9  I don't have any proof.  I don't have anything that I
10 can give you.  Just conversations over the years with
11 have with people.
12      Q   Getting back to the log cabin, you
13 said the defendant had originally put up some money.
14 Did I understand that correctly?
15      A   There was some money put up.
16      Q   By Mr. St. Germain?
17      A   Or his entity.  I don't know where or
18 who it could -- where it came from, but there was
19 some money up front to close on the land and the
20 house deal.
21      Q   When you say, "his entity," what
22 entity are you referring to?
23      A   Parker Place, maybe, or Cornerstone
24 Management.
25      Q   Was this money in checks or cash?
```

88

```
1       A   In checks, I believe.
2       Q   Did you see those checks?
3       A   I don't believe I ever saw the checks
4  personally.
5       Q   Do you know about how much money was
6  put up?
7       A   I don't know all the details.
8       Q   Do you know what the source of those
9  funds were?
10      A   My speculation would be just income
11 from Parker Place and Cornerstone.
12      Q   Do you know whether Mr. St. Germain
13 was in fact getting income for Parker Place or
14 Cornerstone or the gas station or laundry or car
15 wash?
16      A   Again, I don't know specifically, but
17 I would say that is where it looked like to me it was
18 coming from.
19      Q   And then you said at some point the
20 agreement you had, this oral agreement on the log
21 cabin with Mr. St. Germain, was terminated.  Why was
22 that terminated?
23      A   A number of reasons, but specifically,
24 a default on the deal, the terms and conditions of
25 the deal, and I was done.
```

89

1     Q    Why was it only an oral agreement or a
2  verbal agreement as opposed to something in writing?
3     A    I guess everything that was -- it was
4  all pretty loose and, even in the Grizzly Rose, there
5  was no paperwork.  Just some bad choices.
6     Q    Did you ever ask to have this deal
7  consummated in writing?
8     A    Which deal?
9     Q    On the log cabin.
10     A    No, it was always my house.  It was my
11  house, and he wanted to be involved in it.  He did a
12  lot of legwork and he started the process, but it was
13  always my house, and it was always going to be my
14  house.  He wanted the 50/50, which was the original
15  term, and then quickly, from there, it went to -- it
16  is my house and I am done.
17     Q    Were you ever aware of any source of
18  income from Mr. St. Germain?
19     A    Ever any source?
20     Q    Where he was getting paid, what he was
21  living on.
22     A    Again, my speculation was, it was
23  Parker Place, Cornerstone Management.  I don't know
24  where else he could have had money.  I don't know.
25     Q    Did you have any information as to any

90

1  other assets that Mr. St. Germain had a beneficial
2  interest in or an ownership interest in?
3     A    That is all that I am aware of.
4     Q    How did you believe that
5  Mr. St. Germain was going to be paying you this
6  $2,500 a month rent?  Where was he going to get it?
7     A    Again, with his -- Parker Place and
8  Cornerstone Management.  That is where I am assuming
9  his income was coming from.  It might have been the
10  Grizzly Rose, probably some income from there, and he
11  was looking at a roommate.
12     Q    In terms of a roommate, was there a
13  specific person identified?
14     A    He mentioned Henry.
15     Q    Have you ever met this Henry?
16     A    I have.
17     Q    Can you estimate his age?
18     A    Forty.
19     Q    And what else do you know about him?
20     A    Very, very little.
21     Q    Do you know where he lives?
22     A    Last I have known of him, Dave and he
23  were living together.
24     Q    Do you know what he does?
25     A    Sales or did sell -- speculation

91

1  here -- air compressors or works on compressors or
2  forklifts, maybe.
3     Q    I also believe you testified that the
4  defendant invested over -- you weren't sure how
5  much -- but over $20,000 into this log cabin in the
6  beginning; is that right?
7     A    Yes.
8     Q    So therefore, does the defendant have
9  an equitable interest in the cabin?
10     A    No, he doesn't.
11     Q    Did he forfeit that money?
12     A    Yes, he did.
13     Q    Did you have a discussion with the
14  defendant that he is not going to get anything out of
15  that money, notwithstanding the fact that he put it
16  in?
17     A    Probably not specifically, but he knew
18  the terms of the deal.
19     Q    How about generally?  Did you have any
20  such discussions?
21     A    Maybe generally about the time the
22  vehicle was coming back and -- I certainly did.
23     Q    What did he say?
24     A    He was not confrontational over any of
25  it.  I think he knew what kind of position that he

92

1  put me in and that is why I am here today.
2     Q    Were you aware of the fact that the
3  defendant could not have any interest in real estate
4  while he was on probation?
5     A    I may have vaguely known, but again
6  specifically, I don't know the terms of his
7  probation.  I don't know all the details to that.
8  But if there was some conversation of that, it might
9  have come from a probation officer.
10           Again, whether I have heard that after
11  the fact, or if I heard it before, I don't know when
12  I actually heard that.  If I heard it just recently
13  or maybe in the room today.
14     Q    Did he tell you, I can't be on any
15  papers dealing with real estate, or words to that
16  effect?
17     A    My assumption was, yes, partly because
18  of his problems, but also a bankruptcy that he had.
19     Q    Why would he not be able to be on real
20  estate because of a bankruptcy?  Donald Trump filed
21  bankruptcy and he is all over the place.
22     A    I don't know.
23     Q    Did he ever ask you to lie for him?
24     A    I guess so.
25     Q    What did he say?

97

1  exhibits.  Exhibit Number 37, for me, that is a
2  significant exhibit.  Can you tell me a little bit
3  about how you came into possession of that exhibit
4  again?
5       A    It was just given to me as -- I guess
6  when some of these potential investments had come up,
7  it was given to me as security that this is how I
8  deal with Scott.  And it was not given to me, I don't
9  think -- I don't know why I would have kept it, but I
10  guess I threw some things in a folder.  I had some
11  employment things, and it just showed up, and I
12  showed it to Lee.  I don't even know what this thing
13  is.
14       Q    When you say, "security," explain what
15  you mean by this was some kind of security that
16  St. Germain gave you?
17       A    Not any kind of security for me.  It
18  was just an example that was given to me as an
19  example.
20       Q    For what?
21       A    Of how to do a deal or how -- I don't
22  know.  I really don't know why I have it.
23       Q    Do you recall when he gave it to you?
24       A    It would have been probably around mid
25  1999, maybe somewhere in there.

98

1       Q    Prior to the Grizzly Rose deal?
2       A    I think so.  Around that time frame.
3       Q    Before the Grizzly Rose deal?
4       A    I would think so.  It wasn't intended
5  to be -- my investment in the Grizzly Rose was simply
6  an investment.
7       Q    I am just saying the Grizzly Rose as a
8  time period.
9       A    I don't know why I have that.  I don't
10  know.
11       Q    Now, I wanted to ask you on the log
12  cabin home just very briefly.  When he gave you this
13  option and you didn't want to sign it, I assume it
14  was given to you around the time that it is faxed up
15  there, the date of the fax?
16       A    Yes.
17       Q    Do you recall it being faxed to you?
18       A    Probably.  It looks like October 6.
19       Q    What exhibit are we talking about
20  there again?
21       A    Exhibit 41.
22       Q    And this was given to you, if the fax
23  date is correct, October 6?
24       A    October 6.
25       Q    And was this about the time that the

99

1  whole house deal was falling apart?  He wasn't paying
2  you the payments?
3       A    This is a little bit prior to that by
4  about a month or so.
5       Q    But when he gave you that, you guys
6  were having some kind of dispute you said about
7  putting a swimming pool in and he wanted to do
8  certain things, so this was the solution?
9       A    He wanted me out at some point,
10  because he knew -- well, I think a couple of reasons.
11  One was because the house was considerably underbid,
12  so the costs were going to escalate, and I don't
13  think he liked the terms of the deal, the 50/50, if
14  he was putting in all these extra costs.  This was
15  a way to get me out of it without having a 50-percent
16  ownership in it.  It was a way for him to get me out
17  for a $25,000 buy-out.
18            And then if he put all these extra
19  costs into it, personally, I wouldn't reap the
20  benefits for my 50 percent, and those were the terms
21  of the deal.  Anything over the loan amount, he was
22  going to reimburse in cash or check.
23       Q    When you received this and you said
24  you wouldn't sign it, because that wasn't your idea
25  of the deal -- is that right?

100

1       A    That is correct.
2       Q    Were you in dispute over this at that
3  time?  Were things falling apart on the house?  Were
4  you getting angry and he was angry?
5       A    I don't think we ever got angry with
6  each other.  It was one of those where I felt like I
7  was being taken advantage of and this was just adding
8  to it.
9       Q    So that was October 6?
10       A    Yes.  The fax date is October 6.  The
11  option is dated October 11.
12       Q    Here you are, on October 15, giving
13  this money for the Grizzly Rose deal, and I want to
14  have you kind of explain why things were falling
15  apart there, but here you are writing checks for the
16  Grizzly Rose deal.
17       A    Maybe you are jumping to a little bit
18  too much conclusion on falling apart.  I think Dave
19  has the ability to sell himself and sell his ideas,
20  and this was just another one of those where kind of
21  self-interest has no concern for other people, and I
22  think this was another one of those where this would
23  benefit him and not me, and he wanted the deal.
24            He wanted the house at some point, and
25  this was his presentation to me, and it had nothing

26 (Pages 101 to 104)

---

101

1  to do with that investment there.
2          MR. ALBERTO:  No further questions.
3          Mr. Cohan.
4          MR. COHAN:  Thank you.
5               EXAMINATION
6  BY MR. COHAN:
7      Q    Do you know somebody named Jose
8  Hernandez?
9      A    I do.
10     Q    How do you know Jose Hernandez?
11     A    He works at a warehouse doing work for
12 me for my business.
13     Q    How long has Jose been your employee?
14     A    He is not my employee.
15     Q    Could you describe the nature of your
16 relationship with Mr. Hernandez?
17     A    He works for a vendor of mine.
18     Q    And what is the name of that vendor?
19     A    Codat
20     Q    Is that an acronym?
21     A    No.  That is the whole name.  C-o-d-a.
22     Q    What type of vendor is that?
23     A    Assembly, disk -- assembly work to
24 build packaging.
25     Q    Are you testifying here today under

---

102

1  some sort of granted immunity?
2      A    Yes, I am.
3      Q    When and where did you get this grant
4  of immunity?
5      A    In Denver.
6      Q    When?
7          MR. FOREMAN:  I can state for the
8  record, Mr. Cohan, that I have with me a letter from
9  the United States Attorney for the District of
10 Colorado that encompasses our agreement.
11         MR. COHAN:  I would sure like to get a
12 copy and make this part of the record.  I think it
13 has to do with his credibility.
14         Could we do that?
15         MR. ALBERTO:  Sure.  Let's make a
16 copy.
17     Q    (By Mr. Cohan)  Now, when you got
18 these reimbursements from Mr. St. Germain, did you
19 correct your tax returns accordingly?  Do you
20 understand my question?
21     A    No.
22     Q    Let's go back.  Mr. St. Germain was an
23 employee of yours, and he was on your payroll; right?
24     A    Yes.
25     Q    What type of entity employed

---

103

1  Mr. St. Germain?  Was it a corporation?
2      A    Sole proprietorship.
3      Q    And that is a corporation in which the
4  tax benefits and burdens of the entity flow directly
5  to your personal return; correct?
6      A    That is correct.
7      Q    So you, on your personal tax return,
8  took a deduction for all the amounts that were paid
9  to Mr. St. Germain, something like $40,000; right?
10     A    Yes.
11     Q    But then you were reimbursed for that
12 $40,000; right?
13     A    Yes; that is correct.
14     Q    Did you put that down on your tax
15 return?
16     A    No.
17     Q    That additional $40,000?
18     A    No, he claimed the income.  Dave
19 claimed the income.
20     Q    Dave claimed the income even though
21 you were receiving it.  Is that your testimony?  You
22 understand what I am asking you?
23     A    Yes.
24     Q    You took a deduction for $40,000 even
25 though you didn't really part with it.

---

104

1      A    Dave filed the tax return on that
2  income.
3      Q    He did?
4      A    I am assuming he did.  I gave him a
5  W-2.
6      Q    So the net effect is that you got
7  $40,000 of a deduction and saved, what, $12,000 or
8  $14,000 in income taxes?
9      A    Probably, yes.  There is probably some
10 number there.
11     Q    Is criminal prosecution for tax
12 evasion and filing a false return covered by your
13 immunity agreement, as far as you know?
14     A    I don't know the answer to that.
15     Q    Do you know the civil implications of
16 going after you for fraud penalties and things like
17 that for filing false income tax returns?  Have you
18 considered it in connection with your testimony here
19 today?
20     A    No, I haven't.
21     Q    This also applies to the State of
22 Colorado.  I take it you aren't filing state income
23 tax returns with the State of Colorado; do you not?
24     A    Yes, I do.
25     Q    Have you considered the implications

---

---

113

1  50-percent interest, if he did all these other
2  things, that you say he was required to do to get
3  this 50-percent interest that he was supposedly going
4  to get.
5        But he failed in one or more of these
6  conditions, so whatever work he put in, whatever
7  money was put in by him, or whomever, was forfeited
8  and you were the beneficiary; right?
9              MR. FOREMAN:  I will object to the
10  form of that fairly long-winded question.
11             MR. COHAN:  That is a fair objection.
12  Let me break it down.
13       Q    (By Mr. Cohan)  Mr. St. Germain and
14  you, according to your testimony earlier, had some
15  arrangement with respect to ownership in this log
16  home; correct?
17       A    Initially, yes.
18       Q    And that arrangement required
19  Mr. St. Germain to basically get the entire project
20  done; correct?
21       A    Yes.
22       Q    He was the general contractor,
23  effectively?
24       A    Effectively.
25       Q    He was working for you, because you

---

114

1  were the owner; correct?
2       A    Yes.
3       Q    He had no written document to enforce
4  any claim on the real estate; correct?
5       A    Correct.
6       Q    Have you ever heard anything stated to
7  the effect that, without a writing, any claim to real
8  estate is unenforceable?  Are you familiar with that
9  general rule of law?
10      A    No.
11      Q    Never heard of the statute of frauds?
12      A    No.
13      Q    In any event, you never executed any
14  document that would entitle Mr. St. Germain to make
15  any claim; correct?
16      A    Correct.
17      Q    You just said to him, Well, Dave, if
18  you get this thing built, if you put all the money
19  above and beyond what I have been able to borrow on
20  this property, and if you do all that, and if you get
21  the property occupied or occupy it yourself, and if
22  you make all the payments of rent, then you will get
23  a 50-percent interest in the property; right?
24      A    I didn't go to him with that.  He came
25  with that to me.

---

115

1       Q    So those are the terms of the deal?
2       A    Those were his terms.  Not mine.
3       Q    And you agreed to those terms?
4       A    Yes.
5       Q    And were the terms that you agreed to
6  such, that if he failed in any one of those
7  conditions, that he would forfeit any claim that he
8  might make to any interest in the real estate
9  whatsoever?
10      A    Yes.
11      Q    And that was all his idea?
12      A    Yes.
13      Q    How about the money, from wherever it
14  came from, that you estimated to be $20,000?  That
15  was also forfeited?
16      A    Yes.
17             MR. ALBERTO:  Greater than $20,000.
18             MR. COHAN:  I heard the estimate that
19  it was greater than 20.
20       Q    (By Mr. Cohan)  Did you pay somebody
21  named Mike Coffman $30,000 in connection with actually
22  acquiring the log home itself from Rocky Mountain Log
23  Home?
24       A    I think that was a draw on the
25  construction loan.

---

116

1       Q    In other words, what you are saying
2  is, that came out of the loan?
3       A    Yes.
4       Q    So that wasn't an additional chunk of
5  money.
6        Now, do you recall your first meeting
7  with a probation officer named Mike Wilson?
8       A    I have some recollection of that.
9       Q    Did Mr. Wilson approach you
10  aggressively?
11      A    I don't know if I would classify it as
12  aggressive.  I don't think I would.
13      Q    What did Mr. Wilson say to you about
14  Mr. St. Germain, if you recall?
15      A    Again, best of my recollection, he
16  touched on some of the conditions of his crime and
17  the bank fraud.  No details.  He asked about if he
18  would be involved in any of my finances.  He was
19  concerned about that.
20      Q    You mean in terms of protecting you?
21      A    Protecting me.
22      Q    Predation, so to speak.
23      A    Yes.
24      Q    Anything else you can recall about
25  what Mr. Wilson told you?

129

1    A    That is the way I look at it.
2    Q    So you are clear that you have not in
3    any way, shape, or form taken advantage of
4    Mr. St. Germain?
5    A    Absolutely not.
6    Q    You are not taking advantage of him by
7    depriving him of any benefit from anything that he
8    might have done in connection that log home, because
9    you never promised him anything, other than the deal
10   that he couldn't perform on; right?
11   A    Once he defaulted, it was done.
12   Q    And let's go through the details of
13   Mr. St. Germain's default or defaults.
14        (Mr. Cohan conferred with Client.)
15        MR. COHAN:  Would you mind if we took
16   a very quick break?  I think I can expedite this if I
17   speak with my client.
18        (A recess was taken from 1:33 p.m. to
19   1:38 p.m.)
20   Q    (By Mr. Cohan)  Did you testify that
21   you had lost money on that pickup truck situation?
22   A    I don't know that I testified to that.
23   Q    Do you know whether you did or you
24   didn't?
25   A    It was pretty close to break even.  I

130

1    think there might have been some loss there.
2    Q    How about the motorcycle?  I thought
3    those things were worth more than you paid for them,
4    the Harley-Davidson?
5    A    They can be.
6    Q    Do you know whether you lost any money
7    on the motorcycle?
8    A    I sold it to my brother, so if you
9    want to call that a loss, that is fine.  I gave him a
10   good deal.  I am allowed to do that.
11   Q    It depends on your relationship with
12   your brother as to whether you call it a loss.
13   A    I call it a loss, but he got a good
14   deal.
15   Q    What do you think the house is worth
16   now, the log home?
17   A    I have no idea.
18   Q    How much do you have in it?
19   A    Personally?
20   Q    Yes, sir.
21   A    A construction loan of $330,000,
22   mortgage payments for 13 months at $2,700 or $2,800,
23   on that note, and at least $150,000 to $200,000 in
24   additional costs.
25   Q    Out-of-pocket?

131

1    A    Absolutely.
2    Q    That you put into it?
3    A    Yes, sir.
4    Q    So you said the number was like
5    $320,000 of the loan?
6        MR. FOREMAN:  Which number?
7    Q    (By Mr. Cohan)  The loan amount.
8    A    $320,000 is the loan amount.
9    Q    And you think you have $150,000 into
10   it?
11   A    I would say at least that.  I have not
12   added it up.  I am afraid to.
13   Q    You are afraid to?
14   A    Yes.
15   Q    Why?
16   A    Well, because it was budgeted for
17   330 -- to build and construct and finish.
18   Q    I guess you just mean it as a figure
19   of speech.  I mean, you are not really afraid to add
20   it up.  You spent whatever you have spent; right?
21   A    Absolutely.
22   Q    And you are convinced that the home
23   has more value than what you put into it; right?
24   A    I hope that to be the case.
25   Q    But you don't know?

132

1    A    No, I don't know.
2    Q    Have you looked --
3    A    It was appraised for four something.
4    Q    When?
5    A    At the time prior to construction.
6    Q    And that was in March of 1999?
7    A    No.  October or somewhere in that
8    frame of '99, I believe, prior to closing.  I don't
9    know.  Maybe August.
10   Q    Late summer, early fall of '99?
11   A    Yes.
12   Q    Do you have any notion of what has
13   happened to real estate values in that part of the
14   world, the Franktown area?
15   A    I don't follow it, no.
16   Q    How was it exactly that
17   Mr. St. Germain breached his agreement that
18   dis-entitled him --
19   A    All of the overruns were out of his
20   pocket, which, to date, is $150,000 to $200,000, or
21   who knows.  I haven't added them up.  The rent has
22   been due since January 1 of 2000.
23   Q    Was it habitable at that point?
24   A    No.  It didn't matter.  That was part
25   of the deal.

34 (Pages 133 to 136)

133

1    Q    Starting January 1 of 2000, even if he
2    wasn't able to occupy the property?
3    A    Yes, sir.  That was the deal.  And in
4    addition to the labor required to finish the job for
5    the last 13 or 14 months that I have labored out
6    there, physically.  Those were part of his deal, and
7    he has defaulted on those a long time ago.
8    Q    Now, the Grizzly Ross arrangement with
9    Mr. Berliner and Mr. Lambert, when did you first meet
10   Bob Berliner?
11   A    I am going to say four or so years
12   ago.
13   Q    Do you know how you met him?
14   A    I met him probably at the Stampede or
15   when Dave moved in with him on his trip back here
16   from Boston.  That is where he lived.
17   Q    After Mr. St. Germain got released, he
18   lived with Mr. Berliner?
19   A    Yes.
20   Q    Did you ever visit over at that
21   residence?
22   A    Maybe once or twice.
23   Q    So you knew exactly where it was and
24   the circumstances?
25   A    Yes.

134

1    Q    And did you know that he was paying
2    five hundred bucks a month rent at that time?
3    A    I didn't know what he was paying.
4    Q    Do you recall the premises there,
5    whether they were fancy?
6    A    I had been there once.  Not too
7    elaborate, no.
8    Q    Mr. Berliner said, I think, that it
9    was a 900-square foot house.  Does that sound
10   approximately the size, to your recollection?
11   A    I don't have that recollection.  Not
12   much bigger, but that seems a little small.
13   Q    Did you have any business dealings
14   with Mr. Berliner prior to the Grizzly Rose debacle,
15   if I may call it that?
16   A    No, I didn't.
17   Q    Did you understand, before you anted
18   up $75,000, that Mr. Berliner would have some
19   interest in Durant, Inc., which owned the assets of
20   the Grizzly Rose?
21   A    Did I know that he would have --
22   Q    -- some role in the deal.
23   A    Oh, yes.  He was hired to run the
24   club.
25   Q    And he was hired to run the club as

135

1    part of his putting in $30,000 or $35,000 cash?
2    A    Yes.
3    Q    For which Mr. Berliner was going to
4    get a 30-percent interest?
5    A    Yes.
6    Q    That was your understanding before you
7    put money in the deal?
8    A    Yes, it was.
9    Q    And you were told this by
10   Mr. St. Germain?
11   A    Yes.
12   Q    So to the best of your knowledge and
13   belief, as of that time, Mr. St. Germain had never
14   misled you; had he?  Always told you the truth?
15   A    You know, I had no reason not to
16   believe him.  I don't think he has lied to me.  I
17   don't know.
18   Q    Best of your knowledge, as you sit
19   here, up until that time, he had not lied to you;
20   correct?
21   A    Best of my knowledge, I have no
22   recollection of any lies.
23   Q    Now, do you recall any conversations
24   that you had with Mr. Berliner about your investing
25   the $75,000?

136

1    A    I had very few conversations with
2    Berliner.
3    Q    Well, wasn't it important to you how
4    the club was going to be run?
5    A    Yes, but I did it silently.  I wasn't
6    working there.  I didn't do this to have a job.  I
7    was investing to get a return on my money and that is
8    it.
9    Q    Did you understand that
10   Mr. St. Germain was going to be -- for his reward out
11   of this, going to be managing the club and making six
12   grand a month as the manager of the club?
13   A    Did I know that?
14   Q    Yes.
15   A    No.  I knew there was some
16   compensation set up, but I am not sure of the figure.
17   That seems -- I don't know, that doesn't seem like
18   the number, but I know there was some compensation.
19   Bob was $70,000, I think, annually, and I know Dave
20   was to be compensated for his role.
21   Q    Well, six grand a month would be about
22   $70,000 a year.
23   A    That was Bob's figure.  I don't know
24   that to be Dave's.  I don't know the terms of that.
25   Q    Well, you testified earlier that you

36 (Pages 141 to 144)

141

1    Q    So when you offered to put that money
2  in, your understanding was that Mr. St. Germain was
3  going to be working there and managing the place?
4    A    We had some understanding that he
5  would be involved in it.  I don't know in what
6  capacity and how many hours.  But he was involved in
7  the renovation, but the day-to-day, I am not positive
8  how much involvement there was in the day-to-day
9  hiring and firing.
10    Q    Now, how far along had the log home
11  gotten in terms of its construction and completion by
12  October of 1999, when you invested your money in the
13  Grizzly Rose deal?
14    A    Probably, the foundation was in.  I
15  don't know that any structure was put up until toward
16  the end of the year.  So probably the foundation.
17  Maybe the logs were delivered by then.  I think they
18  were probably on-site.  Again, I am bad with dates.
19    Q    I am just wondering whether
20  Mr. St. Germain had done things for you in connection
21  with the log home, that that gave you a comfort level
22  in terms of his ability to get things done, when he
23  said he would get them done?
24    A    Did I have a comfort level of getting
25  things done?

142

1    Q    Yes, because I am wondering if you
2  didn't, why you would invest $75,000 in the Grizzly
3  Rose, since you didn't have much communication from
4  Berliner, that he knew how to run anything?
5    A    I put all my faith in Dave.
6    Q    And his ability to make sure the place
7  was being run properly?
8    A    He said, I can take care of Bob.  I
9  can control Bob.  I don't know how many times I heard
10  that.  Don't worry about Bob.  I can take care of
11  Bob.
12    Q    Those are sort of famous last words?
13  We are getting laughter from counsel on the record at
14  that response.  They were here yesterday when cowboy
15  Bob testified.
16    A    I am sure that was fun.
17    Q    It was country and western.
18        And the reason why you didn't sue
19  Mr. St. Germain in connection with the loss or
20  apparent loss of your investment is because you knew
21  Mr. St. Germain didn't wind up with any of the money;
22  right?
23    A    I am confident that is the case, yes.
24  I think we all got taken by Berliner.  That is my
25  opinion.  I don't think Dave got anything either.

143

1        MR. COHAN:  I have nothing further.
2  Thank you for your patience.
3        MR. ALBERTO:  I am done.  Thank you.
4        (The deposition concluded at 1:54
5  p.m., Wednesday, January 23, 2001.)

144

1        I, RANDY OVERLEY, do hereby certify
2  that I have read the above and foregoing deposition
3  and that the above and foregoing transcript and
4  accompanying correction sheets, if any, constitute a
5  true and complete record of my testimony.
6
7  Amended sheet(s) attached  [ ]
8  No changes, therefore no Amendment sheet attached [ ]
9
                    _____
                    RANDY OVERLEY
10
11
12                  Subscribed and sworn to before me this
13  _____ day of _____, 2001.
14                  My commission expires _____.
15
16
17                  _____
                    NOTARY PUBLIC
18
19                  _____
                    ADDRESS