IN THE UNITED STATES DISTRICT COUTY
FOR THE DISTRICT OF COLORADO

Civil Action No. 03-F-1041(BNB)

UNITED STATES OF AMERICA,
Plaintiff

v.

DAVID B. ST. GERMAIN, and
RANDY OVERLEY,
Defendants

**Defendant St. Germain's Response to Defendant Overley's
First Set of Discovery Requests**

Defendant David St. Germain, pro se, submits his response to the First Set of Discovery Requests directed at him by Defendant Overley, through his attorney, in accordance with Fed. R. Civ. P. 26, 33, 34 and 36, and the Court's Scheduling Order.

**INTERROGATORIES**

1.   (a)   No one helped me answer these discovery requests.
   (b)   I contacted no one to help me answer these discovery requests.
   (c)   No one provided me with information regarding these discovery requests, except as follows: I contacted AUSA Chris Alberto to inquire as to how I am required by the rules of discovery, to respond to interrogatory questions and request for documents when these requests are so broad and all encompassing for the most part. His reply was to be truthful and simply do the best that I can as to recalling the information being requested and to provide the documents requested if I do indeed have them. If I don't have certain documents being requested, then I can't provide them and I should indicate such if that is the case. Thus, I will put forth a truthful and best efforts response.
   (d)   Other than as indicated in ( c ) above, I did not contact anyone for legal or other advice on whether or how to answer these requests.

2.   This request for information is extremely broad. It is unreasonable to expect me to remember all specific statements made regarding my probation and restitution, including the places, dates and persons present when such statements were made, over a 12-year span. I do however, remember several conversations I had with Randy and several of his family members. One such conversation was a telephone discussion I had with Randy Overley sometime in the month of May, 1997. I was in Massachusetts and

EXHIBIT A-13

was trying to get permission to relocate back to Denver from probation (Kathy Keenan – Probation officer). In explaining my frustration to Randy (over the telephone) with trying to get this permission, he inquired what the hold up was. I explained that I needed to have a relocation plan in place and approved before I would be allowed to move back to Denver. I further explained that because I had 5 years of probation and a $600,000 restitution order, probation needed specifics from me that they could confirm prior to getting relocation approval. The relocation plan would have to include where I would be residing as well as having a firm job offer, providing a description of what the job would entail and whom I would be directly reporting to. I told Randy I already had a place to live lined up, but no job as of yet. Randy then said something like, "So all you need is a job and they'll let you transfer back to Denver?", to which I responded in the affirmative. Randy then said, "Well, I can give you a job". I then indicated that I only needed to show that I had a job different from real estate, since I was not allowed to work in a real estate related job as one of my probation conditions. I further explained that I was involved in negotiations with others to purchase a sizeable office building in Aurora and that once I was able to move back to Denver, I would be involved in the day-to-day management of this office building. Thus, the job I needed to show probation could not be a real job if I was going to be able to manage the new property. I explained that the job needed to have all the markings of a real job, with paychecks/pay stubs issues, which withheld any applicable taxes, FICA and Medicaid/Medicare. I told him I would fully reimburse him on a monthly basis for all of my payroll and his employer FICA match "expenses" he incurred. I remember Randy wondering aloud how he could use these additional "business expenses" to his advantage tax-wise. I indicated to Randy that it would be up to him as to how he wanted to handle the tax implications. Randy then told me that he could offer me a job under those circumstances and that he hoped that I would consider him as an active investor in any other real estate or business deals I might come across once I was back in Colorado. He said he was "getting killed" in income taxes and needed to invest in something that could give him some write-offs. I agreed to introduce him to any deals I would be working on in the future. I then told him I would need an employment offer letter ASAP, to which Randy said he would type up and mail to me in a couple of days.

Randy mailed the employment offer letter to me shortly thereafter. I submitted the letter with my relocation plan to USPO Keenan. She conducted her due diligence and approved my relocation approximately 45 days later.

I also remember meeting with Randy's brother, Larry Overley at 975 Castlewood Canyon Drive sometime in the summer of 1999. This is the site where the log home was constructed and Larry and I discussed how beautiful the plans that Randy and I decided on were. We then discussed his proposal to provide the excavation services for the site. While negotiating for the best price, Larry indicated that, because Randy was involved in the house as a result of my probation restrictions (which I had explained to Larry as the reason the property was solely in Randy's name), and he and I had been friends for a long time, he would reduce his bid, which he did. He further indicated that he would give another 10% discount for cash payments, which I agreed to.

Separately, Randy leased a small office at Parker Place office complex just 3 doors down the hall from my office somewhere around mid 1998. This was a small satellite office from which it was mostly Randy's sister, Kim, and/or his mother, Nadine who worked on a part time basis. Randy was there 2 or 3 times a week himself for short stretches. As best as I could tell, Kim and Nadine mostly took care of most of the mundane office tasks, including bookkeeping for Randy. I would see either Kim or Nadine regularly during the week, as I would stop in when I saw their office door open to say hi. When it came to be the time of the month where I needed to reimburse Randy for the past month's paycheck and his corresponding tax expenses (as well as reimbursements for the new Dodge pick up truck lease, company cell phone and pager bills, log home land loan payments, and later on, motorcycle payments), typically, either Kim or Nadine would hand me "tally sheet" totaling up what amount I needed to reimburse Randy for. All of these monthly "tally sheets" were line itemized in detail and kept running totals going back to the start. Once in a while Randy would be the one handing me the sheet, as he would stop in my office occasionally at the end of the work day to say hi.

3.  As to the history and terms of the log cabin property, they are as follows: I approached Randy in February or March of 1999 to inform him that I had a contract to purchase 13 acres of land in Franktown from an associate of mine, Craig Mundt, for $95,000. I explained to Randy that I wanted to build a log home on the property, but I couldn't do it in my name because of my probation restrictions and my $600,000 restitution obligation. I offered him a 50% equity stake in the deal if he would take title under his name and acquire a convertible construction loan, of which I would do all the leg work to set up. I further explained that Randy would not have to spend any money to do the deal, and would only have to sign for the loan. I would general contract the entire project and thus it would not require any time from Randy, other that what he wanted to spend, if any, to review plans and the like. Randy agreed (as he has stated in his 2001 deposition with AUSA Chris Alberto).

I put $33,500 down and paid the approximately $5,000 in closing costs to purchase the land from Mundt and arranged for Randy to receive an approximate $60,000 loan from 1st Bank in Castle Rock (Sean Nixon was the banker I dealt with). I introduced Randy to Nixon as the principal of the project and I represented myself as the general contractor, which, in fact I was. I did not disclose to Nixon that I had a 50% interest in the house, as I was not included on the loan and did not want probation to discover my interest due to my restrictions. Randy, by himself signed the loan papers and closed on the loan in April of 1999. From April to August of 1999, I worked diligently to line up every subcontractor and the main log homebuilder (Shane Hand) to construct the home. I also spent a great deal of time preparing a construction budget (materials and labor), researching and shopping for materials, preparing the proper documentation in order to receive the numerous permits required by the county and town, and securing the convertible construction loan from Nixon on Randy's behalf. I also made the monthly loan payments on the land. Other than an occasional meeting as requested by Randy to approve plan alterations, Randy did not have to spend any time on this project. Sometime in July/August of 1999, Randy closed on the new loan of $335,000, which was used to pay off the land loan of $60,000 and provide financing in 4 phases for the

construction of the house. My budget called for an additional $150,000 - $200,000 in cash from me to ultimately complete the house. Construction began in August, with Larry Overley beginning excavation work at the site.

Over the course of the next 5 months, I was on the site twice per day to oversee the project, as well as most Saturdays. Sometime in December of 1999, Randy informed me that he had information that I was being investigated by the "Fed's" for probation violations and that he was getting nervous. I told him I was aware of such and that I was also nervous but I was working on handling the issues as best I could. Construction went on with me in charge for another month until just around the beginning of 2000 when Randy told me that his lawyer had informed him that I was under heavy investigation. Based on his lawyer's advice (Lee Foreman), Randy wanted to sever all ties with me. He wanted me off the project. I was not happy about this but I had no control over the situation because the property was not in my name, as my 50% interest in the property was hidden behind Randy's ownership. At this point, the house was approximately 85% - 90% complete and I had over $110,000 of my own money in the project.

Thus, the terms of my agreement with Randy Overley is that we each have a 50% equity stake in the property. If Randy wants to own 100% of the property, in my opinion, the fair course of action would be to establish a fair market value, subtract the note amount as well as the amount of cash Randy has in the property (based on the level of amenities Randy and I had discussed). The difference would represent the property's equity, which should be split 50-50. In addition, I should be reimbursed the approximately $110,000 that I have in the property. That is the deal we agreed to. The fact that Randy chose to sever ties with me and pull me from the project is his sole decision and should not effect the terms of our agreement. Up until the point that I was removed from the project, I had lived up to my end of the deal 100%. Randy did not have to invest any time nor money at all, as was our deal. The fact that he ultimately had to finish the project at his own expense was his decision.

4. Larry Overley-Landtech Contractors: $21,750
16777 E. 2nd Ave, D-104
Aurora, CO 80011
303-344-1518

Shane Hand-Hand Crafted Log Homes $12,280
34464 Upper Bear Creek Rd.
Evergreen, CO 80439
303-674-2287

Home Depot $11,958
14001 E. Mississippi Ave.
Aurora, CO 80012
303-743-7557

Rocky Mountain Log Homes $ 6,955

1883 Hwy. 93
S. Hamilton, Montana 59840
406-363-5680

| | |
|---|---|
| Randy Overley<br>Land down payment and closing costs | $40,608 |
| Ligon Trucking<br>Freight charge-1/3 shipment log home kit<br>Don't have address or tel. # | $ 1,366 |
| Oakley Bros. Trucking<br>Freight charge-2/3 shipment log home kit<br>Don't have address or tel. # | $ 2,732 |
| InterRural Electric Assn. (IREA)<br>Provide electric service to site<br>Don't have address or tel. # | $ 2,187 |
| MCS Portable Restroom Svce.<br>1305 E. Cheyenne Rd.<br>Colorado Springs, CO 80906<br>719-475-2361 | 264 |
| Elvin's Rentals<br>652 S. I-25<br>Castle Rock, CO 80104<br>303-688-6883 | 273 |
| Yocam Excavating<br>21904 Cougar Ct.<br>Elbert, CO 80106<br>303-648-3835 | 375 |
| Douglas County<br>100 3rd St.<br>Castle Rock, CO 80104<br>303-660-7497 | $ 3,999 |
| Tri-County Health Dept.<br>7000 E. Belleview, #301<br>Englewood, CO 80111<br>303-220-9200 | 300 |
| Neff Rental<br>8401 E. Iliff Ave. | 198 |

|  |  |
|---|---|
| Denver, CO  80231<br>303-755-8222 |  |
| High Plains Survey<br>345 Comanche<br>Kiowa, CO  80117<br>303-621-8672 | 398 |
| Geo-Technica Engineering<br>PO 266<br>Franktown, CO  80116<br>303-660-0300 | $ 1,025 |
| Randy Overley<br>H/D Motorcycle | $ 6,660 |
| **TOTAL:** | **$112,328** |

5. The Government has never made any promises to me in return for my assistance and cooperation in recovering any monies owed under my restitution order. The judge sentenced me under Rule 35, which as you know means that, should I assist the Government, and the Government feels that my assistance is of value, then they have 1 year to petition the court to reduce my sentence by some amount commensurate with the value of my assistance. There was no promise there. Only my hope that the Government would find my assistance to be valuable enough to file such a petition, and if they did so, I was hopeful that the court would agree that my sentence should be reduced by some amount. Regardless of what the prosecutor might have suggested as a sentence reduction, the judge was not bound by any such suggestion. He did not have to grant any reduction at all, if he did not feel one was warranted. As a point of fact, the prosecutor did not make any reduction recommendation and left that decision up to the judge.

6. In approximately February of 2001, just after the government took the deposition of Randy Overley, among       others, I, upon consulting with my attorney, Bill Cohan, concluded that the Overley deposition was very damaging to me and thus, I decided that it would be in my best interest to cooperate with the government in disclosing my assets. I believe that Bill Cohan and myself met with AUSA's Chris Alberto, Tom O'Rourke and USPO Mike Wilson in Mr. O'Rourke's office to inform all present that I was willing to assist them by fully cooperating in recovering my restitution monies by disclosing my assets.

7. Lambert: Since the judge ordered me not to communicate with Lambert when he sentenced me in February 2001, I have inadvertently bumped into him twice. Once at 24 Hour Fitness in Aurora sometime in April 2003. It was a brief meeting with a simple hello, shaking of hands, and I moved to the locker room, as

he was on his way out. I again ran into him in approximately June/July at the same place. We spoke for about 30 minutes and discussed my electrocution injury, the ongoing negotiations he was then having with the government to settle a lawsuit similar to this one, as well as his requesting money from me to help with the deficit that the Parker Place office complex was apparently running. I told him that I had zero money, as I wasn't working due to my accident and I was in fact indebted to family members for close to $100,000 due to legal costs. I told him I could not help. I reported both of these communications to probation promptly after each meeting. In between those meetings and the last time I spoke with him is close to 2 years of incarceration. Although I did speak to Lambert occasionally prior to my incarceration in April 2001, I cannot recall when, where and of what substance those conversations were concerning with any specific certainty.

Overley: According to my recollection, I have spoken with Overley twice since February 2001. The first time was just after his deposition in 2/01, just outside the deposition conference room in a downtown building I can't recall. He said to me that he had to tell the feds everything he knew because they were putting a lot of pressure on him and his family. He told me to "make my best deal", as he had been put in the position of having to "make his best deal", which included immunity as long as he disclosed the complete truth. I shook his hand and told him I understood and I had no hard feelings. I still have no hard feelings. I simply feel that he should return my interest in the house based on what we agreed to, and as he has already admitted was our agreement. Any other costs or losses Randy may have incurred are completely separate from this deal and should be treated as such. I inadvertently ran into him approximately 3 months ago at the Grizzly Rose nightclub in the men's room. I said hello and shook his hand. I said something on the order of acknowledging that I realize the moment was awkward, but I wished him well. As I was exiting the men's room, I told him that in the end, I hoped that the outcome would be a fair one and I believed that it would be. With that, Randy turned red and with a fair amount of emotion stated, "You have no idea what fair is!" He continued to say something, but I couldn't hear him as I told him that I had to leave as I wasn't even suppose to be talking to him. I saw him sitting with his brother Larry at the bar, so I stayed at the other end of the club, until they left. I had no further communication with him. I informed probation of my chance meeting with Overley the next day. Again, other that the conversations I've described in paragraph 4 above, I cannot recall any other conversations I may have had with Overley with any specificity.

Government: Most recently, I spoke with AUSA Chris Alberto on 4/23/04, as described in paragraph 1 above. Prior to that I have spoken to Mr. Alberto several times over the period since I was named as a co-defendant with Overley. Because I am representing myself, the reasons I have spoken with Mr. Alberto have been to discuss various aspects of the case, much the same as Overley's attorney has spoken with Mr. Alberto along the same case specific lines.

8. I have commenced one bankruptcy in my life. That was in Colorado, in approximately September of 1993. A creditor attempted to throw me into bankruptcy in Massachusetts sometime in the late 1980's or maybe 1990,91; I don't remember specifically and I don't keep records nearly that long. I fought that bankruptcy petition and prevailed. Thus there is only the one that I filed in Colorado in 1993.

9. Joseph & Pauline St. Germain, Parents
   Marc St. Germain, Brother
   34 Birchmont St.
   Tyngsboro, MA  01879

   Paula MacClellan, Sister
   66A Merrimack Rd.
   Amherst, NH  03031

   Sharon Folsom, Sister
   6623 Lakehurst
   Dallas, TX  75230

   Ken St. Germain, Brother
   162 Trull Lane East
   Lowell, MA  01852

   Bill Hewitt, Part-time Roommate
   623 Clayton St.
   Denver, CO  80206

10. Bill Pierce
    36456 El Camino Dr.
    Palmdale, CA  93551
    661-947-9015

    Craig Mundt
    3586 S. Elkhart St.
    Aurora, CO  80014
    303-888-3341

    Scott Lambert
    2600 S. Parker Rd. -- 6-262
    Aurora, CO

    Randy Overley

    Ken Mueller
    5035 McIntyre

Golden, CO 80402
303-279-2413

Bob Berliner
Las Vegas
Address/tel. # unknown

Jim Gerlitz
Address/tel. # unknown

Curt Lochmiller
Address/tel. # unknown

Roger Duncan
Address/tel. # unknown

Roger Gomez (?)
Address/tel. # unknown

Broker representing the Old Spaghetti Factory building in Aurora
Address/tel. # unknown

Gary Schlatter
Address/tel. # unknown

Jeff Kob
Address/tel. # unknown

NOTE: There may be other individuals with whom I have negotiated or participated in a business transaction with since 1994, but I cannot think of anyone else at this moment. The above list only includes purchase and sale transactions, and not leases, which are too numerous to remember.

11. This is obviously an unreasonably broad request. However, a detailed response to this can be found by obtaining a copy of USPO Mike Wilson's petition to revoke my probation. That pretty much details the information you are seeking with this request.

## ADMISSIONS

1. There is no written contract per se, as to the log home. There is however, a firm agreement as I've described in paragraph 3 above and it is further evidenced by Overley's statements in his February, 2001 deposition with AUSA Chris Alberto, along with the fact that I have personally invested over $110,000, as described in paragraph 4 above.

2. DENIED. I made loan payments to Overley on the land purchase in an amount approximating $450/month from approximately June 1999 to September 1999. I also reimbursed Overley $33,484 for the down payment to purchase the land the log home was built on, as well as $4,774 for the closing costs associated with the purchase of the land.

3. I did not commit a criminal action when I violated the terms of my probation, which was specifically noted in my probation revocation hearing. I only violated the terms of my probation, not criminal law. And to my recollection, I was never arrested, therefore I do not know from what date you would like me to respond.

4. ADMITTED.

5. ADMITTED.

6. DENIED.

7. ADMITTED.

**CERTIFICATE OF SERVICE:** I certify that on May 4, 2004, a copy of the foregoing *Defendant St. Germain's Response to Defendant Overley's First Set of Discovery Requests* was served on the following:

**By Mail:**
AUSA Christopher Alberto
U. S. Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way – Suite 9200
Boston, MA  02210

**By Mail:**
Attorney Ty Gee
Haddon & Foreman, Esquire
150 E. 10th Ave.
Denver, CO  80203